McKAY III, Chief Judge.
hThe defendant, Glenn Elliott, appeals his convictions and sentences for aggravated rape, aggravated kidnapping, and armed robbery, while his codefendant, Jermaine Rumley, appeals his convictions for aggravated rape, aggravated kidnapping, and armed robbery. Finding no patent errors or merit to their respective assignments of error, their convictions and sentences are affirmed.
STATEMENT OF THE CASE
The defendants, Glenn Elliott and Jermaine Rumley, were jointly charged by grand jury indictment in Count 1 with aggravated rape, a violation of La. R.S. 14:42; in Count 2 with aggravated kidnapping, a violation of La. R.S. 14:44; and in Count 3 with armed robbery, a violation of *646 La. R.S. 14:64.[1] The defendants both pleaded not guilty at their March 7, 2012 arraignment. On September 20, 2012, |athe trial court denied the defendants’ motions to suppress the evidence and statements.
On May 20, 2014, trial commenced and continued on until May 23, 2014, when a twelve person jury found both Glenn Elliott and Jermaine Rumley guilty as charged on all counts. On June 26, 2014, the trial court denied the defendants’ motions for new trial and for post-verdict judgment of acquittal. Glenn Elliott was sentenced to life imprisonment at hard labor on each of Counts 1 and 2,[2] and fifty years at hard labor without benefit of parole, probation, or suspension of sentence on Count 3, all sentences to run concurrently. Jermaine Rumley was sentenced to life imprisonment at hard labor on Counts 1 and 2, and fifty years at hard labor on Count 3, all sentences to run concurrently and be served without the benefit of parole, probation, or suspension of sentence. The defendants’ appeal followed.
FACTS
On the afternoon of January 26, 2012, the victim, a licensed practical nurse, was scheduled to visit a hospice patient on Thalia Street. She parked her car in front of the patient’s home. While the victim was sitting in her parked car talking on her cellphone, she was suddenly confronted by two masked black males brandishing firearms who commanded her to surrender her money and valuables. One of the black males, later identified to be Darren Holmes, began to rummage through the victim’s car. Darren Holmes then got into the vehicle and forced the victim at gunpoint to drive around the neighborhood and park at an abandoned house. Darren Holmes then forced the victim at gunpoint into the abandoned house and proceeded to rape her. David Quinn, along with defendants Glenn |aElIiott and Jermaine Rumbley, entered the abandoned house after seeing the victim’s car parked outside. Glenn Elliott and Jermaine Rumley joined Darren Holmes in raping the victim. When they were finished, the group stole the victim’s personal belongings and fled the scene.
ERRORS PATENT
A review of the record reveals no patent errors.
DISCUSSION
In this appeal there are a number of assignments of error claimed by the defendants both counseled and pro se that are addressed below.
SUMMARY OF PERTINENT TESTIMONY ELICITED AT TRIAL
The victim’s supervisor testified that in 2012, the victim was employed at a home health care and hospice service. The witness testified that on January 26, 2012, the day of the rape, the victim was scheduled to visit a patient on Thalia Street. That afternoon she received a telephone call from a private sitter, that occasionally sat *647 with some of their patients, who informed her that she had been on the telephone with the victim when the incident began. The witness testified- that she had personally received a telephone call from the victim approximately three hours later when the victim was at home. Based on what the victim told her had transpired, she advised the victim not to change clothes, bathe, wash, wipe anything, or even go to the bathroom.
The witness arranged to. meet the victim at Touro Infirmary, only to be informed that the hospital did not perform forensic rape examinations. The witness said that when she initially saw the victim,.she was crying, anxious, disheveled, dirty, and appeared to be in shock and opined that this was atypical behavior for victim. From Touro Infirmary, they went to University Hospital where the victim |4was examined by. a Sexual Assault Nurse Examiner (“SANE”). The witness stayed at the hospital with the victim until 3:00 or 4:00 a.m. and she drove the victim home.
Detective Kevin Williams of the New Orleans Police Department (.“NOPD”) Sex Crimes Unit testified that on January 30, 2012, he took over the victim’s case, and learned that on January 26, 2012, the victim reported having been raped by approximately five unknown black males in the 1300 block of South Gayosó Street. Detective Williams identified a- map of the Zion City area, a New Orleans neighborhood: He marked on the map the locations where the victim was kidnapped on Thalia Street, and where she was raped. In the course of his investigation, he was able to obtain the phone records for the victim’s cellphone, which had been reported stolen during the incident. The records indicated that a call was placed from the victim’s stolen cellphone to Katrina Olivier. The police went to Ms. Olivier’s residence and learned the nickname of the individual who made that call, “Bizzle.” “Bizzle”- was ascertained to be Justin Elliott. On February 1, 2012, NOPD Officers went to Justin Elliott’s residence. He agreed to go to police headquarters, where he gave a statement identifying Jermaine Rumley as the person who gave him the victim’s stolen cellphone. Justin Elliott also identified the first and last names of four of the five individuals who were ultimately charged— Glenn .Elliott, Jermaine Rumley, Darren Holmes, and Brian Beasley — and the first name, “David,” of a fifth individual later determined to be David Quinn. Detective Williams showed Justin Elliot a single photograph containing four individual photos that Justin Elliott confirmed were of the four individuals he had fully named. Brian Beasley turned himself into the police, and the other three individuals were later apprehended together.
[(¡Detective Williams determined David Quinn’s last name using the NOPD motions computer and additional information supplied by Justin Elliott as to the address of .the person he only knew as “David.” He obtained an updated photograph from David Quinn’s school. David Quinn was taken into custody where he gave three statements denying knowledge of the crimes in the first two, and finally admitting . the facts in' his third statement. ■David Quinn stated that the two gunmen involved were Darren Holmes and Glenn Elliott, and that .Darren Holmes had been the individual who first approached the victim as she sat in her vehicle. Detective Williams also testified that the faces of the perpetrators were, covered during the incident and the victim was unable to identify anyone.
Detective Williams testified that he obtained search warrants on February 6, 2012, for buccal swabs (DNA samples) from Glenn Elliott and Jermaine Rumley. Justin Elliott voluntarily gave a buccal *648 swab. Detective Williams submitted this evidence to NOPD Central Evidence and Property. This evidence and the forensic evidence collected from the victim were later transported to the Louisiana State Police Crime Lab.
Detective Williams confirmed that David Quinn identified Darren Holmes as having been armed with a weapon. David Quinn never admitted that he had a weapon or that he had engaged in sexual activity with the victim.
Justin Elliott testified that Glenn “Gunner” Elliott and Jermaine “Jerky” Rumley were his cousins and were from the Zion City neighborhood. He testified that on January 26, 2012, he was at “the studio,” later determined on cross-examination to be a studio in the 4300 block of Thalia Street, where he recorded his rap music. He testified that, while in the studio, he observed Glenn Elliott and Jermaine Rum-ley, along with Darren Holmes, David-Quinn, and Brian Beasley, ^leaving an abandoned house with their faces covered by white T-shirts. He had seen Darren Holmes before then, with his face uncovered. He also saw all five of them later that day with their faces uncovered.
Justin Elliott testified that later that same day, Glenn Elliott told him that Jermaine Rumley had a phone he was not using. Justin Elliott testified that Jermaine Rumley gave him the phone. Justin Elliott testified that he used the phone to call his daughter’s mother, and that was how the police tracked him down.' He was not in possession of the phone when Detective Williams came to his home as he had given it to Darren Holmes. He said Detective Kevin Williams showed him some photographs of Glenn Elliott, Darren Holmes, Brian Beasley, and Jermaine Rumley, which he identified in globo and signed the backs of those photos. He confirmed that he subsequently identified David Quinn’s photo on February 11, 2012, at which time he also gave the police a DNA sample.
Justin Elliott testified that he was never coerced for his testimony. He testified that his testimony given at trial was the truth, and he confirmed that his testimony before the grand jury was truthful.
Joan Cooper, R.N., was qualified by stipulation as an expert in the field of sexual assault examination. Ms. Cooper testified that she was on call on January 26, 2012, and she came in to examine the victim, who had presented herself at the emergency room of University Hospital. She identified the victims’s medical records from her forensic examination and treatment in connection with that visit. The victim related details of her being confronted by two men with guns at both windows of her vehicle asking for money, her subsequent kidnapping to an abandoned house, and her being raped by four to six unknown black males. She reported that the perpetrators did ejaculate but that a condom was used during the 17rape. She said she had consumed no medications, drugs or alcohol before or after the assaults. Ms. Cooper noted some redness in the victim’s cervix, which she said was not normal. She also noted some discharge during the cervical examination, Ms. Cooper estimated that in her ten years as a sexual assault examiner, given the elasticity of the body, she had only seen major tears or bruising in ten percent of the cases. She said the victim was post-menopausal. She noted abrasions on the victim’s right arm and forearm, her left thigh, knee and shin, her left shoulder, and the lower left flank area of her waist/abdomen. Her feet had a lot of soiling. Ms. Cooper identified anatomical diagrams depicting the victim’s injuries. She also identified a CD of photographs that she took of the victim during her examination, showing *649 the victim’s abrasions, bruising, and some broken toenails.
Ms. Cooper collected the victims’s clothing and underwear; a fingernail swab and clippings; blood samples; oral, vaginal and anal swabs; and a miscellaneous swab. She identified a crime lab specimen collection log and described the contents of a rape kit. She stated that the collected items of evidence were placed in envelopes and sealed; placed into the kit and sealed; and then the kit was placed in a refrigerator to be secured until picked up by the appropriate law enforcement authorities. A urinalysis revealed blood in the victim’s urine, which Ms. Cooper said was not normal. The victim was given Kaletra and Combivir, antiviral medications to help protect her immune system from exposure to the HIV virus; Zofran, an anti-nausea medication given because Combivir and Kaletra have a tendency to cause stomach upset; Vicodin, for pain; “Plan B” to prevent conception; and medications for sexually transmitted disease (STD) exposure.
IsDavid Quinn testified that he was seventeen years old in January 2012, and living in the uptown area of New Orleans. He knew Glenn Elliott, Jermaine Rumley, Brian Beasley, and Darren Holmes through a cousin of Glenn Elliott. He testified that on the day of the crimes, he had left school, caught the Broad Street bus, got off, and went to an apartment next door to Brian Beasley’s home. There, he met those four individuals, including the two defendants. They all went to an abandoned house to smoke marijuana. He said Darren Holmes and Glenn Elliott asked him if he wanted to rob someone with them; he agreed to participate. Darren Holmes and Glenn Elliott then procured a gun. They all walked around a corner, planning to rob three “Mexicans.” They went into an open location to put on masks and horse around. By the time they got around to committing the robbery, the “Mexicans” were gone. They walked around the block and saw a lady in a car. David Quinn said he and Glenn Elliott fell back, seeing no need for all five to go up to the car and rob the lady. He said Darren Holmes put the gun to the head of the lady, got into the back seat, and drove off. He and Glenn Elliott then took their masks off. The car came around a corner, and he and Glenn Elliott covered their faces. The car pulled up at the abandoned house. He identified the abandoned house as the place where they had previously smoked marijuana. David Quinn identified the location where the victim was parked at the time she was first confronted by Darren Holmes. David Quinn later identified photos of the outside and the inside of abandoned house where the rape occurred.
David Quinn testified that when the car pulled up at the abandoned house, he and Glenn Elliott put their “masks” back on and went towards the car. David Quinn testified that Jermaine Rumley appeared, and “we” (presumably meaning himself and the defendants Rumley and Elliott) searched the victim’s car. They |flthen entered the downstairs of the abandoned house where he observed the victim performing oral sex on Darren Holmes. He said Darren Holmes had-the gun towards the victim’s head. David Quinn said he grabbed the victim’s head to look at her, saw that she was older, and did not assault her. When later asked by the prosecutor how the victim looked when he pulled her head back, David Quinn replied: “Frightened.” David Quinn said he stepped back, and Jermaine Rumley “pursue[d] to get oral sex.” David Quinn said he walked outside, and when he came back in, Glenn Elliott was having sex with the victim from the back, while Darren Holmes was receiving oral sex from her at the same time. David Quinn identified Darren Holmes *650 when Darren Holmes was brought into the courtroom.
' David Quinn clarified that he fii-st saw the victim performing oral sex on Darren Holmes at gunpoint, then on Jermaine Rumley, and then on Darren Holmes as Glenn Elliott was raping the victim from behind, David Quinn said he and Jermaine Rumley then left and went back to the other abandoned house to smoke marijuana. He testified that Darren Holmes and Glenn Elliott showed up with “the keys, the iPod, and the phone,” whereupon they went to a street running along the canal, and the keys were thrown’ into “the water.” David Quinn said that afterward, he and Jermaine Rumley went to Jermaine Rumley’s house. He did not know where Darren Holmes and Glenn Elliott went.
David Quinn noticed the defendants’ photos in a newspaper on the morning of Eebruary 11, 2012. He said he later saw the .defendants as he walked to the bus stop, and they assured him that no one was going to say his name. David Quinn said that a detective came to his home later that day. He accompanied the detective to the police station, where he signed ■a waiver of rights and was interviewed. David Quinn admitted he was less than entirely forthcoming in that hofirst interview,. and also in a second one, although he confirmed that he always did say that it had been an armed robbery in which they were involved. David Quinn said that by the time he was interviewed a third time, he felt- guilty and detailed the rape incident. •'David Quinn confirmed that he had pleaded guilty in September of 2013 to armed robbery in exchange for a sentence of eighteen years for his involvement in the crime. He said he wanted to get on with his life; he felt guilty for what happened; and he just wanted to tell the truth and move on, David Quinn identified Glenn Elliott and Jermaine Rumley in open court. He also testified that, after the assault and robbery, he saw Darren Holmes give a cell phone to Jermaine Rumley.
The victim, who was a fifty-five years old white female at the time of' the rape, testified that she had- not been able to return to work after the robbery and rape. She said that on the day in question she was in her parked vehicle talking via a Bluetooth ear piece on her cell phone to “Mary,” someone who sits with patients. She was also gathering up her equipment, getting ready to go inside to visit a patient. She sensed someone’s presence and turned to see a male with a black gun. His face was masked with a white patterned handkerchief. The victim stopped talking to Mary, who kept calling her name. Addressing her as “bitch,” the gunman told her to give him her money.. The victim said Mary screamed in her ear over the phone, asking what was wrong. The gunman told her to disconnect the phone, but then grabbed it out of her lap.. He again demanded money, and she told him she had none. He walked around the car, entered the rear seat, and began rummaging around. He told her to pull up her shirt, and she did so, , pulling out her bra and sort of shaking it to show there was no money in it. The gunman then entered the front passenger seat of the victim’s vehicle, pointed the gun at her, and In told her to drive. He directed her, addressing her as “bitch,” and telling .her to drive faster. They ended up at an old run down house with a double driveway and a stairway in the middle. She parked in one of the driveways.
The gunman then told her' to get out. One of her clogs got stuck on the brake pedal, and she left it there, too fearful to reach down and pick it up. -She said she was really scared, and the male had the gun on her the whole time. They walked *651 underneath the stairs and to one side of the bottom of the residence. He told her to undress, addressing her as “bitch” and telling her to take off all of her clothes when she hesitated to remove her underwear. He then unbuckled his pants, displayed his genitals, and demanded oral sex. He held a gun to her heád the whole time, telling her not to look at him or he would kill her. He heard a noise, stopped, and walked away, telling her not to move or he would'kill her. He returned seconds later ánd forced her to resume performing oral sex on him. Not long after that , she heard footsteps, and others came from behind her, unbuckling their pants, and successively stepping in front of her as she was on her knees, forcing her perform oral sex on them. They started talking about condoms, even asking her if she had any in her vehicle. They began raping her vaginally and then anally. She said she began crying out in pain during the anal penetration.
The victim said that eventually she believed her attackers had left. She began dressing, putting on her underwear, only to have to have someone yell at her from the front of the basement: “I didn’t [tell] you you could get dressed, bitch.” She sat there for a while longer, before hearing what sounded like a car engine or car driving off. She thought it might be safe to get up, so she put on a lab , coat, walked out to the street. Realizing where she was, she walked back to her patient’s, home, where she said someone telephoned the police. She asked them not to, | ]2feeling she needed to calm down and gather her thoughts, and believing she could not make sense of it all to anyone. She told the police she would call them back.
The victim testified that she then contacted her late son’s first wife, with whom she had remained close. That former daughter-in-law arrived, and they walked back to the victim’s car. Her ex-daughter-in-law telephoned for a tow truck, since the victim did not have her car keys. She was driven home after her vehicle was towed away.. Her attackers had taken her. driver’s license and house key. The victim said she. was worried about someone going to her home and harming her children. She wanted to go thereto make sure her two sons, then twelve and sixteen years old, who would come home from school by themselves, were okay. At home she telephoned her.supervisor, who told her she had to go to a hospital. The supervisor agreed to meet the victim at Touro Infirmary. Touro referred the victim to University Hospital, where the victim underwent a sexual assault examination by the “SANE” Nurse Cooper, who previously testified. She also gave a statement there to a police officer.
The victim was asked on cross-examination about antidepressant medication being found in her vehicle after the crimes. She said she .took antidepressants after her oldest son died on November 9, 2009, while in military - service. She said that on the day of the .crimes, she arrived at her patient’s home between 3:30 and 4:00 p.m. She admitted that she could not identify the person who initially confronted her with the gun, although she assisted in compiling a composite picture of him, with the bottom' of his face masked. She could not identify any of the other individuals who subsequently came to the abandoned residence. She did not see any of their faces. The victim replied in the affirmative when asked whether each individual sexually assaulted her, but she could not remember how many there |13were. When asked whether each individual assaulted her more than once, she could not say: “Cause I don’t — I can’t identify. So I don’t know.” She was asked about the voice she heard when she first began to dress her *652 self, calling her a “bitch” and asking her who told her she could get dressed. She could not tell whether that voice was similar to the voice of her initial assailant. When asked about the accuracy of her report given to the “SANE” nurse at University Hospital-that four to six men entered the room, she said: “I guessed, tried to guess how many voices I was hearing. It was all just a guesstimate. I don’t know. Cause I did not look. I did not turn around and look [sic] how many — how many people were in there.”
Leslie Landry, a forensic DNA analyst at the Louisiana State Police Crime Lab, was qualified as an expert in the field of forensic DNA analysis. Ms. Landry testified that DNA evidence established that Glenn Elliott could not be excluded as a minor contributor to the sperm fraction cells derived from two posterior fornix swabs (taken from the uppermost portion of the vaginal cavity) submitted under the agency case number A-36813-12. The NOPD item number in the present case was A-036813-12 — the same number. Ms. Landry testified that the swabs contained a DNA mixture that was consistent with being a mixture of two individuals, and that that the victim and Glenn Elliott could not be excluded as contributors of that DNA. Ms. Landry testified that, statistically, the likelihood that the DNA mixture consisted of the DNA of the victim and Glenn Elliott versus the victim and some random person in the population was, for-the Caucasian population, 1.87 trillion [to one]; for the Black population, 329 billion; and for the Southwest Hispanic population, 1.4 trillion. Similarly, Ms. Landry testified, as to a cervical swab, that the sperm fraction was consistent with being a mixture of the [ 14DNA of the victim and Glenn Elliott. She said that statistically, the likelihood that this DNA mixture consisted of the DNA of the victim and Glenn Elliott versus the victim and some random person in the population was, for the Caucasian population, 215 quadrillion [to one]; for the Black population, 59.7 quadrillion; and for the Southwest Hispanic population, 695 quadrillion.
Ms. Landry testified that, a third, even stronger statistical sperm fraction DNA match for Glenn Elliott (his full DNA profile) was found in an analysis of DNA from a swab taken off of discharge found on the victim’s underwear — Glenn Elliott could not be excluded as the major contributor to the DNA (Caucasian population, 7.94 sextillion; Black population, 19.6 sextillion; Southwest Hispanic population, 39.4 sextil-lion).
A fourth DNA sperm fraction match for Glenn Elliott was derived from a stain on the victim’s scrub pants, with the same statistical probabilities as in the cases of the third sperm fraction match. In addition, from the DNA derived from epithelial fraction from this same stain on the victim’s scrub pants, Glenn Elliott could not be excluded as the minor contributor. Finally, Ms. Landry testified that rectal swabs from the victim were positive for the presence of seminal fluid, but provided insufficient matei-ial for DNA analysis.
All six of the individuals involved, Glenn Elliott and Jermaine Rumley, Darren Holmes, Brian Beasley, David Quinn, and Justin Elliott, were excluded as contributors from the DNA profiles derived from (1) a swab taken from the victim’s right fingernail; (2) a swab taken from clippings from her left hand; (3) swabs taken from the passenger door handle of her vehicle; (4) swabs taken from the front passenger seat; (5) a swab from a condom wrapper; (6) a swab taken from another condom wrapper; (7) a swab taken from one side of a condom (Ms. Landry 11fisaid she could not even definitively say that the condom had the victim’s DNA on it); and (8) the *653 other side of the same condom (no victim’s DNA). Four oral swabs from the victim all tested negative for the presence of spermatozoa.
Reverend Lisa Fitzpatrick, a character witness for Glenn Elliott, testified that she is the executive director and founder of the Apex Youth Center (“Apex”), the religious community center located in the Zion City neighborhood. She testified that Glenn Elliott had attended bible study on Sundays, which she conducted in her home, and he that he had gone to her Apex center. She said he attended service regularly until the day he was arrested. When asked whether she considered him to be a violent person, Reverend Fitzpatrick, replied: “Absolutely not.” She said he was never mean or aggressive.
On cross-examination, Reverend Fitzpatrick testified that she knew his nickname was “Gunner.” She admitted that she was aware of his prior arrests in October 2011 for possession of stolen things valued at one thousand five hundred dollars or more, resisting arrest by refusing to identify himself, and distribution of legend drugs; his November 2011 arrest for illegal possession of stolen things; and his arrest in the present case.
Janifer Tropez-Martin, M.D., qualified as an expert in the field of obstetrics/gynecology, is an assistant professor of medicine at Tulane University School of Medicine, and the medical director of Louisiana Healthcare Connections. She testified that approximately sixty to seventy percent of women in menopause or perimeno-pause have a reduction in vaginal secretions. She also testified that “usually” the vagina, perianal body and the anus “sort of shrinks once you’re menopausal,” and the vagina loses its elasticity. She subsequently qualified that testimony, saying “not so much the anus.” She confirmed that a woman can |1ñget lacerations through normal vaginal sexual activity, but also admitted that she actually had never performed a rape examination where there were any lacerations in the vagina or on the perineum. However, when questioned whether it was possible for a person of non-reproductive age to “make it through” a sexual assault by five to seven people without there being any lacerations, she testified that she would expect to see “in a forced situation” some sort of evidence of that having occurred. She testified that there could be evidence of penetration of the anus.
Dr. Tropez-Martin criticized the lack of documented detail for the sexual assault examination performed on the victim. She said there was no sampling of pubic hair, which could mean that there was no pubic hair to sample, but it was not clearly set forth in the report. She said there was no detail regarding the pelvic examination, and insufficient detail as to the description of the vulva and vagina. She said the notation of redness and a discharge noted in the multi-page record of the victim’s medical treatment from University Hospital, really meant nothing and that it could have been a normal exam. When asked whether that document “told her anything that that particular victim was attacked by six to eight men,” Dr. Tropez-Martin replied: “It doesn’t say that it did or did not happen, no.”
On cross-examination, she agreed that a woman of the victim’s age could be forcibly raped and not experience vaginal injuries. She testified that she had never conducted a rape examination of a woman as old as the victim. She admitted that she was requested to testify by defense counsel. She admitted that she was receiving a fee for testifying. She confirmed on cross examination that, based on what she saw and read, she could not conclude anything insofar as the victim having been raped.
*654 |17Oneka Rumley, Jermaine Rumley’s mother, testified that on January 26, 2012, she left home around 3:00 p.m. to take her daughter Charmaine Rumley to work in Kenner. When asked who her other passengers were, Ms. Rumley replied: “Rosh-enika Rumley, Charmaine Rumley, and Jermaine Rumley.” When subsequently asked whether it would be true to say that between 2:00 p.m. and 6:00 p.m. she was in a car with Jermaine Rumley, she replied: “Correct.” Ms. Rumley testified that after dropping off Charmaine, she returned to her home before leaving for an appointment between 5:00 and 6:00 p.m. to view a potential residence for the family located in the Gentilly neighborhood. When asked whether defendant Jermaine was with her when she left her home to view the Gentilly residence, she replied: “Correct.” She replied in the affirmative when asked whether it was safe to say that between the hours of 2:00 p.m. and 7:00 p.m. the defendant Jermaine Rumley was with her.
Ms. Rumley confirmed on cross examination that on January 26, 2012, Jermaine Rumley resided with her. She clarified that she did not pick up her daughter Charmaine from Charmaine’s residence in the Falstaff Apartments until 3:00 p.m.
Ms. Rumley confirmed she never told law enforcement authorities that she had been with her son Jermaine on January 26, 2012, even after she learned of the date of the alleged rape. She learned two or three days after January 26, 2012 that Jermaine was wanted, when law enforcement authorities came to her home looking for him, and she said that date was the last time she saw him before he was arrested. She said law enforcement authorities came to her home approximately every other day looking for him until he was arrested on February 3, 2012. Ms. Rumley confirmed that until the prosecutor subpoenaed her to come to the district | ^attorney’s office and give a sworn statement, she had never told anyone that she had never taken her eyes off Jermaine on January 26, 2012.
The 76 year old son of the victim’s patient, testified that on the day in question he was present when a young woman came to his mother’s home (presumably referring to the victim) and told his mother and his sister that she had been attacked. He thought the woman was his mother’s home health care worker. He recalled that the woman was at his mother’s home between 3:30 and 4:00 p.m. on the day in question. She (the victim) went out and sat on the porch for a while until some friends arrived, whereupon they all went around the corner to where the attack allegedly occurred. He said the woman’s car was parked in the driveway. He said the woman seemed upset. He said neither her white pants nor her floral pattern top looked soiled. He did not think her hair seemed out of place. He was there until the tow truck arrived and the woman left with friends.
Tina Laurent testified on rebuttal that she was the business office director for Emeritus, an assisted living center. She handled the payroll and time cards, and she was the custodian of records for the business. She testified that Charmaine Rumley had been employed at the center as a resident assistant. Ms. Laurent identified Charmaine Rumley’s time card, reflecting that she came to work at 1:55 p.m. on Thursday, January 26, 2012. Ms. Laurent confirmed that Charmaine Rumley, as a resident assistant, would have had to check in with a supervisor when she came into work. Ms. Laurent testified that on Friday, January 27, 2012, Charmaine Rumley clocked in at 2:11 p.m. On both days she was expected to be at work at 2:00 p.m.
*655 [1SDEFENDANT JERMAINE RUM-LEY’S ASSIGNMENT OF ERROR
In his sole assignment of error, Jermaine Rumley argues that the evidence is insufficient to support any of his three convictions — for aggravated kidnapping, aggravated rape, or armed robbery.
Jermaine Rumley specifically alleges that none of the State’s witnesses identified him as the one imprisoning the victim, nor forcibly seizing and carrying her from one place to another. None of the State’s witnesses identified him as forcing the victim to perform oral sex with a dangerous weapon/while two or more people participated. None of the State’s witnesses identified him as taking something of value from the victim while he was armed with a dangerous weapon. No physical evidence places him at the scene of the crime. He specifically attacks the testimony of State witness David Quinn and additionally argues that, even accepting David Quinn’s testimony, the evidence is nevertheless insufficient to support his convictions. The defendant does not argue in his sufficiency of the evidence claim that the victim was not kidnapped, raped, and arm robbed.
This Court set forth the well-settled standard of review for sufficiency of the evidence in State v. Watkins, 2013-1248, 2013-0931, pp. 13-14 (La.App. 4 Cir. 8/6/14), 146 So.3d 294, 303 (quoting State v. Huckabay, 2000-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111), as follows:
In evaluating whether evidence is con: stitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (LaApp. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of 12pthe evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. ■ Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof .of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
The testimony, of a single witness, if believed by the trier of fact, is *656 sufficient to support a conviction. Watkins, 2013-1248, p. 14, 146 So.3d at 303 (citing State v. Wells, 2010-1338, p. 5 (La. 4 Cir. 3/30/11), 64 So.3d 303, 306). A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. Watkins, supra.
The due process standard of review under Jackson v. Virginia does not sanction juror speculation if the evidence is such that a reasonable factfinder must have a reasonable doubt. State v. Higgins, 2003-1980, p. 17-18 (La.4/1/05), 898 So.2d 1219, 1232; State v. Gordon, 2013-0495, p. 18 (La.App. 4 Cir.7/16/14), 146 So.3d 758, 770.
When the identity of the defendant as the perpetrator is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia, supra. State v. Galle, p. 31 (La.App. 4 Cir.2/13/13), 107 So.3d 916, 935; State v. Everett, 2011-0714, p. 15 (La.App. 4 Cir.6/13/12), 96 So.3d 605, 619.
La. R.S. 14:42 defines aggravated rape, in pertinent part, as follows:
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3)When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
⅜ ⅜ ⅜
(5) When two or more offenders participated in the act.
[[Image here]]
B. For purposes of Paragraph (5), “participate” shall mean:
(1) Commit the act of rape.
(2) Physically assist in the commission of such act.
La. R.S. 14:44 defines the offense of aggravated kidnapping, in pertinent part, as follows:
Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender’s actual or apparent control:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
La. R.S. 14:64 defines armed robbery as follows:
A. . Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
La. R.S. 14:24 defines the law of principals as follows:
*657 122All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Justin Elliott admitted that he was a convicted felon on parole at the time he testified at trial. Jermaine Rumley does not mention, much less attack, Justin Elliott’s testimony in his sufficiency argument. As referenced above, Justin Elliott testified that on January 26, 2012, he was in his recording studio when he observed Glenn Elliott and Jermaine Rumley, along with Darren Holmes, David Quinn, and Brian Beasley, leaving an abandoned house with their faces covered by white T-shirts. He elaborated on cross-examination that he stepped out onto his front porch and saw the same five individuals on South Salcedo Street with their faces uncovered.
David Quinn, like Glenn Elliott and Jermaine Rumley, had been arrested in connection with the crimes and indicted for aggravated rape, aggravated kidnapping, and armed robbery of the victim. He testified that he had pleaded guilty to the armed robbery count and received a sentence of eighteen years.
As noted above, David Quinn testified in great detail about what transpired on the day of the incident including that he witnessed both Glenn Elliott and Jermaine Rumley raping the victim. David Quinn also testified that following the incident, he and Jermaine Rumley left the scene and went back to another abandoned house, on South Salcedo Street, smoked marijuana and walked through an empty lot to get to South Salcedo Street. He testified that Darren Holmes and Glenn Elliott had the victim’s “keys, the iPod, and the phone” which they threw into a canal with the exception of the cell phone. David Quinn testified that he saw Darren Holmes give a cell phone to Jermaine Rumley.
| asDavid Quinn’s testimony was supported by the testimony of the reluctant witness Justin Elliott, a cousin of both defendants. David Quinn’s testimony was also supported by physical evidence, including the multiple matches of Glenn Elliott’s DNA to DNA derived from swabs taken from the victim during her sexual assault examination on the evening of the crimes and from stains on her underwear and scrub pants.
The victim’s testimony was entirely consistent with David Quinn’s testimony describing the entire ordeal involving her rape, sexual assault and robbery. It is not disputed that the victim’s car was towed from the scene, supporting both her testimony that her keys were stolen and David Quinn’s testimony that after the attack Darren Holmes and Glenn Elliott, had thrown the keys into a canal.
The victim’s testimony was also supported to a degree by defense witnesses Glenn Dabney and Romalice Anderson, two residents of the Zion City neighborhood, who both observed her in the aftermath of the crimes.
Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Jermaine Rumley (1) orally raped the victim, where the victim was prevented from resisting the act by (a) threats of great and immediate bodily harm accompanied by apparent power of execution from another principal to the act, and/or (b) because another principal to the act was armed with a dangerous weapon, ánd/or (c) under circumstances where two or more offenders participated in the act (aggravated rape); (2) was a principal to the victim’s forced imprisonment in the *658 basement at gunpoint where he and others sexually assaulted her, -with her submitting in order \9Ato survive and ultimately be released;[3] and (3) was a principal to the taking of the victim’s property by force or intimidation while another principal was armed with a gun (armed robbery) — Jermaine Rumley actually ended up in possession of the victim’s cell phone, and her armed robbery had been the initial object of the group.
There is no merit to Jermaine Rumley’s sole assignment of error.
DEFENDANT GLENN ELLIOTT’S ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, Glenn Elliott argues that the trial court erred in denying his challenge for cause as to Juror No. 3. Glenn Elliott’s supplemental counseled appellate brief addresses this first assignment of error.
Louisiana Constitution article I, § 17(A) guarantees a defendant the right to full voir dire examination of prospective jurors and the right to challenge jurors peremptorily. In trials of offenses necessarily punishable by imprisonment at hard labor, such as in the present case, each defendant shall have twelve peremptory challenges, and the State shall have twelve for each defendant. La.C.Cr.P. art. 799. Prejudice is presumed when a defendant’s challenge for cause is erroneously denied and he has exhausted all of his peremptory challenges. State v. Carmouche, 2001-0405, p. 8 (La.5/14/02), 872 So.2d 1020, 1028; State v. Kirk, 2011-1218, p. 10-11 (La.App. 4 Cir. 8/8/12), 98 So.3d 934, 941.
When a defendant uses all twelve of his peremptory challenges, a trial court’s erroneous ruling on a defendant’s challenge for cause that results in the deprivation of one of his peremptory challenges constitutes a substantial violation 12fiOf his constitutional and statutory rights, requiring reversal of his conviction and sentence. State v. Juniors, 2003-2425, p. 7-8 (La.6/29/05), 915, So.2d 291, 304. Therefore, to establish reversible error in the denial of one of his challenges for cause, a defendant needs to show: (1) that he exhausted all of. his peremptory challenges; and (2) that the trial court erred in refusing to grant his challenge for cause. Camouche, 2001-0405, p. 8, 872 So.2d at 1028. See also Juniors, 2003-2425, p. 8, 915 So.2d at 305.
Glenn Elliott argues that Juror No. 3 was not impartial. La.C.Cr.P. art. 797 sets forth the grounds for challenges for cause, including the ground that the prospective juror is not impartial, stating in pertinent part:
The State or the defendant may chal-1 lenge a juror for cause on the ground that:
⅜ ⅜ ⅜
(2) The juror is not impartial, whatever the:cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court'is satisfied, that he can render an impartial verdict according to the law and the evidence;
The prosecutor questioned the first veni-re panel as to whether the jurors had personally been a victim of violent crime or had a close friend or family member who *659 had been a victim of a violent crime. Juror No. 3 replied that she had, and she was further examined at a side bar outside the presence of the rest of the venire panel. Juror No. 3 stated that she had been molested at the age of thirteen, and the perpetrator had been tried and found guilty. When asked whether, as a result of that experience, she thought she could still sit and weigh the facts and evidence in the case, Juror No. 3 replied: “Absolutely.” The prosecutor said he did not have any further questions, whereupon the trial court asked whether either defense | ^counsel had any questions. One defense counsel replied that he did not, and no further questions were asked of Juror No. 3 concerning this subject.
The only question the defense directed to Juror No. 3 and the other jurors on the panel, in order, was whether she/he had any objection to putting the “subject mat-, ter” of the case aside insofar as judging the credibility of the witnesses. Juror No. 3 replied “No” to that question.
During the challenge conference for the first venire panel, the following colloquy transpired between defense counsel and the court concerning Juror No. 3:
BY MR. CAPASSO:.
You know, Miss — Juror Number 3, just the fact that she stated her'— what she went through, on its face, regardless of -her answer being that I wouldn’t let it affect me, I’m — out of [sic] abundance of caution, I’m concerned that—
BY THE COURT:
Do you have a challenge?
BY MR. CAPASSO:
Yes. The challenge is that during a trial like this, that something can come up that could — could affect her and the risk of my clients not having a fair trial and having a juror that could — the potential of it is so great that because, of the incident, we’re asking to strike her for cause.
BY THE COURT:
That is not valid basis for a challenge for cause. And this juror, Miss [-], did not say anything that would indicate that she could not be fair and objective throughout this trial. Although she did note that she was a victim of a violent crime, she clearly stated that she could be fair and listen to the facts and evidence. I’m going to deny your cause for challenge [sic] and I will note your objection.
BY MR. CAPASSO:
Okay.
In State v. Ruffin, 2011-0135 (La.App. 4 Cir. 12/21/11), 82 So.3d 497, the defendant was convicted of one count of second degree murder and one count of manslaughter. On appeal, the defendant argued that the trial court had erred in | a7denying his challenge for cause of a .juror whose thirteen-year-old great-niece had been killed in a violent crime. When asked whether that would affect her ability to sit on the jury, the juror replied: “It may.” When questioned further, the juror told the prosecutor that-she was “quite sure I’ll be emotional because I will have flashbacks, because I still have not gotten over that yet. And her killers have not been found.” Id., 2011-0135, p. 25, 82 So.3d at 514. This Court found no abuse of the trial court’s denial of the challenge for cause, noting that the juror did not say unequivocally that her grand-niece’s death would prevent her from being an impartial juror, and that, while she stated that she might be emotional because of violent crime, she did not indicate that her emotional state would have an adverse effect upon her deliberation as to the defendant’s guilt.
*660 Here, Juror No. 3 stated that she “absolutely” thought she could still sit and weigh the facts and evidence in the case despite her having been sexually molested at the age of thirteen. She was fully engaged in the voir dire process, and defendant has failed to show that the trial court abused its discretion in finding that the juror could be fair and impartial, thus denying the defendant’s challenge for cause.[4]
There is no merit to this assignment of error.
DEFENDANT GLENN ELLIOTT’S ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, Glenn Elliott argues that the evidence was insufficient to support his convictions for the aggravated kidnapping and armed [28robbery of the victim.[5] For the following reasons, there is no merit to this argument.
Glenn Elliott does not dispute that the evidence was sufficient to convict him of the aggravated rape of the victim. While Glenn Elliott was raping the victim, he was also engaged in the "imprisoning” of the victim, with the specific intent to force her to submit to sexual intercourse in order to secure her release from that place, as contemplated by La. R.S. 14:44(3), just as in the case of his co-defendant, Jermaine Rumley.
As to his conviction for armed robbery, David Quinn, as referenced above, testified that he and the other defendants had the primary goal of armed robbery in their initial interaction with the victim, with Darren Holmes acting on behalf of the group. David Quinn further testified that Jermaine Rumley appeared, and “we” (presumably meaning himself and Jermaine Rumley and Glenn Elliott) searched the victim’s car — as the victim was inside the abandoned residence with Darren Holmes. Glenn Elliott and Darren Holmes later showed up with the victim’s keys, her “iPod” (tablet) and her cellphone.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Glenn Elliott was a principal to the aggravated kidnapping and armed robbery of the victim.
DEFENDANT GLENN ELLIOTT ASSIGNMENTS OF ERROR NO. 3 and 4
In his third assignment of error Glenn Elliott argues that his two life [gi)sentences are unconstitutionally excessive (Assignment of Error No. 3), as well as his fifty-year sentence for armed robbery (Assignment of Error No. 4).
La.C.Cr.P. art. 881.1(E) provides that the failure to make (an oral objection) or file a (written) motion to reconsider sentence shall preclude a defendant from raising an objection to the sentence on appeal or review. This Court has repeatedly held that the failure to file a motion to reconsider sentence or otherwise object to the sentence (oral objection at the time sentence is imposed) precludes a defendant from raising a claim about his sentence on appeal. State v. Mack, 2012-0625, p. 6 (La.App. 4 Cir. 5/6/15), 162 So.3d 1284, 1288; State v. Jones, 2014-1118, p. 1617 (La.App. 4 Cir. 4/1/15), 165 So.3d 217, 227-228 (“But the trial record is clear that no objection was made to the sentence which *661 was imposed at the time of sentencing and no motion to reconsider the sentence was filed. Thus Mr. Jones failed to preserve the claim of excessiveness of his sentence for our review.”)(footnote omitted); State v. Alexander, 2006-1274, p. 10 (La.App. 4 Cir. 5/16/07), 958 So.2d 1203, 1208.
In the present case the record does not reflect that Glenn Elliott or either of his defense counsel objected to any of his three sentences at the sentencing hearing, or that a written motion to reconsider any of the sentences was filed on his behalf at any time.
Accordingly, Glenn Elliott is precluded from raising any objection to his sentence on appeal or review.
DEFENDANT GLENN ELLIOTT’S PRO SE ASSIGNMENT NO. 1
In his first pro se assignment of error, Glenn Elliott argues that he was denied what he characterizes as his Sixth and Fourteenth Amendment constitutional rights when his counsel prevented him from testifying on his own |80behalf. He asserts that he specifically told his attorney that he wanted to testify, but his attorney told him he did not need him to testify and that he could handle the case without him testifying.
The record reflects that on May 23, 2014, after the jury, the judge, the defendants and all attorneys had returned from visiting the scene of the crimes, but prior to the jury returning to the courtroom for the continuation of the defense’s presentation of its case, the trial court questioned Jermaine Rumley and Glenn Elliott, as to their respective rights to testify on their own behalf:
BY THE COURT:
... Mr. Elliott, let me have you step up. As to your right — you don’t have to testify. But I do want to place on the record if you are freely waiving that right. Mr. Elliott, do you understand, sir, you have the right to testify on your own behalf, sir?
BY DEFENDANT ELLIOTT:
Yes, ma’am.
BY THE COURT:
And at this time are you waiving the right to testify?
BY DEFENDANT ELLIOTT:
Yes, ma’am.
BY THE COURT:
All right. So that the record is clear. And have either of you in any way been forced or coerced or threatened into waiving this right?
BY DEFENDANT ELLIOTT:
No, ma’am.
A defendant’s right to testify in his own defense at a criminal trial is guaranteed by the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution. Rock v. Arkansas, 483 U.S. 44, 51-53, 107 S.Ct. 2704, 2708-2710, 97 L.Ed.2d 37 (1987); State v. Hampton, 2000-0522, p. 5-7 (La.3/22/02), 818 So.2d 720, 724725. That right to testify is also guaranteed a criminal defendant by La. Const, art. |3]I, § 16. State v. Dauzart, 99-3471, p. 6-7 (La.10/30/00), 769 So.2d 1206, 1207-08. Denial of a criminal defendant’s right to testify is not amenable to harmless-error analysis. Hampton, 2000-0522, p. 14, 818 So.2d at 729. When a criminal defendant does not take the stand to testify, a court should presume he has knowingly and voluntarily waived his right to do so. State v. Marzett, 2013-0274, p. 13 (La.App. 4 Cir. 8/28/13), 123 So.3d 831, 839 (citing Hampton, 2000-0522, p. 14, 818 So.2d at 727). A defendant can only rebut such presumption by showing that his attorney caused him to forego his right to testify. Hampton, 200522, p. 14, 818 So.2d at 729 (quoting, Passos-Paternina v. United States, 12 *662 F.Supp.2d 231 (D.P.R.1998)). To make that showing a defendant must: (1) allege, specific facts, and present an affidavit by his trial attorney, from which a court can reasonably find that the attorney informed the defendant “that he was legally forbidden to testify or in some similar way compelled him to remain silent;” and (2) demonstrate that the record would support a finding that those specific factual allegations would be credible. Id., 2000-0522, p. 14, 818 So.2d at 729-730.
In his concurrence in Hampton, supra, Louisiana Supreme Court Justice Victory stated: “Trial judges may be able to avoid problems in this area by having the defendant (out of the jury’s presence in jury cases) make his choice of whether or not to testify at trial on the record, after explaining this right to the defendant.” Hampton, 2000-0522, p. 15, 818 So.2d at 730. This is precisely what the trial court in the present case did.
Even had the trial court not expressly advised Glenn Elliott of his right to testify and ascertained that he freely was waiving that right, Glenn Elliott has failed to present an affidavit by his trial attorney from which a court could reasonably find that his attorney informed him that he was legally forbidden to | aatestify or in some similar way compelled him to remain silent. Nor has the defendant demonstrated that the record would support a finding that such specific factual allegations would be credible. Therefore, he has failed to show that he was denied his constitutional right to testify.
There is no merit to this assignment of error.
DEFENDANT GLENN ELLIOTT’S PRO SE ASSIGNMENT NO. 2
In his Pro se Assignment of Error No. 2, Glenn Elliott argues that his counsel was ineffective because he “failed to object and move for a mistrial” when the State introduced other crimes evidence in violation of his Sixth and Fourteenth Constitutional rights.
This Court set forth the applicable jurisprudence on ineffective assistance of counsel in State v. Rubens, 2010-1114, pp. 58-59 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 66-67, as follows:
As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post-conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted. State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802. However, where the record is sufficient, the claims may be addressed on appeal. State v. Bordes, 98-0086, p. 7 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147. Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438, p. 6 (La.10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606, p. 10 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel’s performance was deficient; and (2) he was prejudiced by the deficiency. Brooks, supra; State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. Counsel’s performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. Counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant must show that there is a *663 reasonable probability that, but for counsel’s deficient performance the result of the proceeding would have been different; “[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
This Court has previously recognized that if an alleged error falls “within the ambit of trial strategy” it does not “establish ineffective assistance of counsel.” Bordes, 98-0086, p. 8, 738 So.2d at 147 (quoting State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4 Cir.1986)). Moreover, as “opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” Id. (quoting State v. Brooks, 505 So.2d 714, 724 (La.1987)).
The defendant complains of questions asked by the prosecutor during the State’s cross-examination of a witness who can only be described as a character witness for Glenn Elliott, the Reverend Lisa Fitzpatrick, who testified on direct examination as to Glenn Elliott’s involvement with her church and a youth center she founded in the Zion City neighborhood where the crimes occurred. When Reverend Fitzpatrick, was asked whether she considered Glenn Elliott to be a violent person, she replied: “Absolutely not,”. She also said he was never mean or aggressive, and that during his time at her youth, center he participated in all of the activities offered there.
The prosecutor asked Reverend Fitzpatrick on cross-examination whether she was aware of Glenn Elliott’s prior arrests in October 2011 for illegal possession of stolen things valued at one thousand five hundred dollars or more, resisting arrest by refusing to identify himself, and distribution of “legend” drugs; and his November 2011 arrest for illegal possession of stolen things; and his arrest in the present case. She admitted that she was aware of those arrests.
The defendant is correct that evidence of other crimes, wrongs or acts committed by a defendant is inadmissible because of the “substantial risk of grave prejudice to the defendant.” State v. Rose, 2006-0402, p. 12 (La.2/22/07), 949 So.2d 1236, 1243 (quoting State v. Prieur, 277 So.2d 126, 128 (La.1978)). However, La. C.E. art. 404 ’states in pertinent part:
A. Character evidence generally. Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
(1) Character of accused. Evidence of a pertinent trait of his character, such as a moral quality, offered by an accused, or by the prosecution-to rebut the character evidence; provided that such evidence shall be restricted to showing those moral qualities pertinent to the crime with which he is charged, and that character evidence cannot destroy conclusive evidence of guilt.
Pursuant to La. C.E. art. 404(A), when a defendant chooses to put his character at issue by introducing evidence of his good character, the State is entitled to introduce evidence of the defendant’s bad ■character in rebuttal, and it may cross-examine defendant’s' character' witness about .his or her knowledge of defendant’s particular conduct, prior arrests, or other acts relevant to the moral qualities pertinent to the defendant’s crime. State v. *664 Norfleet, 96-2122, p. 6 (La.App. 4 Cir. 10/21/98), 721 So.2d 506, 510.
In Norfleet, the defendant was found guilty of first degree murder for the drive-by shooting of a nine-year-old boy. On appeal, the defendant argued, in part, that the trial court erred in allowing the State to introduce evidence concerning other crimes committed by him. The State introduced the complained of evidence in rebuttal to character evidence presented by the defendant. The defendant presented testimony by one of his former teachers, who described him as a well-behaved student — obedient, willing to learn, truthful and very respectful. On cross-examination, the prosecutor asked the teacher if she recalled an incident where the defendant took a knife to school. When the teacher said she did not, the ^prosecutor, over the objection of defense counsel, showed the witness a document indicating that the defendant had been disciplined for taking a knife to school.
Citing La. C.E. art. 404(A)(1), this Court found no error by the trial court in permitting the prosecutor to present that evidence. This Court noted that the defendant’s three character witnesses had all testified that the defendant was an obedient student who respected others, did not cause trouble, and was truthful, quiet and easygoing. Thus, this Court found, given that the defendant placed his character in question, the State was entitled to question the former teacher concerning the specific incident in which the defendant was disciplined for taking a knife to school.
In his present pro se assignment of error, the defendant does not mention La. C.E. art. 404(A)(1). Defense counsel asked questions of the character witness, the Reverend Fitzpatrick, directed to Glenn Elliott’s character for violence, aggressiveness and “meanness,” moral/behavioral qualities pertinent to his aggravated rape of the victim, as well as his actions as a principal to the aggravated kidnapping and armed robbery of her. Reverend Fitzpatrick was also asked questions by the defense eliciting answers tending to portray Glenn Elliott in a positive light, e.g., that he was preparing to be baptized in her church, that he participated in many youth activities at her youth center.
The questions asked of Reverend Fitzpatrick on cross-examination by the State as to Glenn Elliott’s two arrests in October and November 2011 for illegal possession of stolen things were marginally relevant to moral qualities pertaining to armed robbery of the victim in the present, case, and thus his defense counsel cannot be deemed ineffective in failing to object to that evidence. Further, even assuming for the sake of argument that the information as to defendant’s arrests for | ^resisting arrest by refusing to identify himself and distribution of “legend” drugs might not be relevant to moral qualities pertinent to the crimes of aggravated rape, aggravated kidnapping, or armed robbery, evidence of these crimes tended to rebut the general tenor of Reverend Fitzpatrick’s testimony that Glenn Elliott was a “good kid”.
Finally, we cannot rule out that defense counsel might have chosen the tactic of not objecting to evidence of these latter two arrests, for resisting arrest by failing to provide identification and distribution of “legend” drugs, for fear of appearing as though he was trying to hide something from the jury — particularly given that evidence of the two arrests for illegal possession of stolen things was admissible. It is well-settled that if an alleged error falls “within the ambit of trial strategy” it does not establish ineffective assistance of counsel. Rubens, 2010-1114, p. 59, 83 So.3d at 67.
*665 There is no merit Glenn Elliott’s claim that his counsel was ineffective in failing to object to the introduction of evidence of his prior arrests during the State’s cross examination of Reverend Fitzpatrick — or in not moving for a mistrial pursuant to La. G.Cr.P. art. 770(2), which provides for a mandatory mistrial when, inter alia, the district attorney, during trial or in argument, refers directly or indirectly to “[a]n-other crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.”
Lastly, it is well-settled that the erroneous admission of other crimes evidence is subject to harmless error review. State v. Garcia, 2009-1578, p. 55 (La.11/16/12), 108 So.3d 1, 39 (citing La.C.Cr.P. art. 921); State v. Johnson, 94-1379, p. 14-15 (La.11/27/95), 664 So.2d 94, 100-01 (errors leading to improper admission of evidence subject to h'armless-error analysis; error harmless if verdict ls7“surely unattributable” to error) (quoting Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)). In light of the considerable evidence of Glenn Elliott’s guilt presented to the jury — and considering the relatively venial nature of the other crimes evidence elicited by the State during its cross-examination of Reverend Fitzpatrick — the verdict was “surely unattributable” to any error in the admission of such evidence. Accordingly, it cannot be said there is a reasonable probability that, but for defense counsel’s alleged deficient, perform-anee in failing to object to the State’s reference to the other, crimes, the result of the proceeding would have been different.
In this assignment Glenn Elliott also argues that .his counsel was ineffective with regard to the admission of evidence concerning defendant’s 2013 arrest for aggravated rape in connection with the sexual assault of fellow inmate in Orleans Parish Prison. However, the defendant fails to assert in what Way defense counsel’s performance was deficient in this regard, or even point to a place in the record where this evidence was either admitted or commented upon by the prosecutor. The State did- timely file, pursuant to La. C.E. art, 412.2,[6] a pretrial notice of intent to introduce evidence of “the defendants’ [Glenn Elliott and Darren Holmes] subsequent. act of sexually assaultive behavior against the victim D.L. |¡¡«The State, intends to present evidence based on the facts and circumstances outlined in the 'Orleans Parish Sheriff’s Office Report, Item Number 1-35386-13,” which was attached to the notice.
The record does not reflect that defense counsel filed a written objection to this notice of intent by the State to introduce evidence pursuant to La. C.E. art. 412.2, and no héaring was held as to' the admissibility of such evidénce. La. C.E. art. 412.2 does not require a hearing. State v. Williams, 2002-0898, p. 6 (La.10/15/02), 830 So.2d 984, 987; State v. Farrier, 2014- *666 0623, p. 20 (La.App. 4 Cir. 3/25/15), 162 So.3d 1233, 1246. Nor does the defendant point to a place in the record where his defense counsel objected to the admission of such -evidence. In any case, the evidence 'was clearly admissible under La. O.E. art, 412.2(A) and, while Glenn Elliott asserts that such evidence was highly prejudicial and made it impossible for him to get a-fair trial, he fails to make any argument that the probative value of such evidence was substantially outweighed by its prejudicial effect as per the balancing test of La, C.E. art. 403. Thus, he has failed to show the evidence was inadmissible under La. C.E. art. 412.2, and thus that his counsel’s performance in not objecting .to it — if indeed he failed to do so — was ineffective.
There is no merit to any part of the present assignment of error. ’
DEFENDANT GLENN ELLIOTT’S PRO SE ASSIGNMENT NO. 3
In his third pro assignment of error, Glenn Elliott argues that his counsel was ineffective because there was a conflict of interest in the same counsel representing both him and his co-defendant Jermaine Rumley.
| snA criminal defendant’s right to assistance of counsel is guaranteed by the Sixth Amendment to the UlS. Constitution [7] and La. Const, art. I, § 13.[8] When counsel has a conflict of interest, the conflict may thwart the assertion of a full defense to- criminal charges. State v. Garcia, 2009-1578, p. 37 (La.11/16/12), 108 So.3d 1, 28. Such conflicts usually arise in the context of joint representation. Id. (citing Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680(1942)). However, joint representation does not violate the Sixth Amendment or La. Const, art. I, § 13 unless it gives rise to an actual conflict of interest. Id. (citing State v. Ross, 410 So.2d 1388, 1390 (La.1982)).
“In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer’s performance.” Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980); Garcia, 2009-1578, p. 42, 108 So.3d at 31. The defendant must prove an actual conflict existed — “the possibility of conflict is insufficient to impugn a criminal conviction.” Sullivan, 446 U.S. at 350, 100 S.Ct. 1719. The Court in Sullivan noted that “a possible conflict inheres in almost every instance of multiple representation.” Id., 446 U.S. at 348, 100 S.Ct. 1718.
| ,inPrior to the presentation of the first witness at trial in the present case, on May 21,"2014,'the State asked the court to advise the defendants that they had the right to have separate counsel but had elected not to avail themselves of that right. The trial court stated that it had *667 advised both the defendants of their rights to separate counsel “on many occasions.” The trial court again asked each defendant if he understood that he had the right to have separate counsel advise him 'on this issue. Each defendant replied in the affirmative. The trial court noted that it had advised the defendants, who were cousins, against proceeding to trial with the same counsel. The trial court noted that defense counsel George Gates had continued to say there was no conflict in his representation of both defendants. Mr.-Gates spoke up to say that, “to this day,” there had not been any conflict, and trial commenced with both defendants represented by George Gates and David Capasso.
Thus, Glenn Elliott expressly waived his right to separate counsel prior to trial. His counsel stated that to that point, immediately prior to trial, there had been no conflict. Glenn Elliott points to no place in the record where he subsequently objected to a conflict in his trial counsels’ representation of both him and Jermaine Rumley. He also essentially concedes that he made no such objection by the citation of Sullivan, supra, in his appellate brief for the proposition that a defendant who raises no objection at trial to a conflict must demonstrate that an actual conflict adversely affected his counsel’s performance. • Thus, the burden is upon Glenn Elliott to point to evidence in the record establishing that an actual conflict existed; he failed to meet this burden. .
In this assignment of error, Glenn Elliott raises again the meritless issue he raised in his Pro se Assignment of Error No. 1, relative to his counsel preventing |41him from testifying in his own behalf. As previously discussed, the record reflects that defendant expressly waived his right to testify in his own behalf.
The record also reflects that Glenn Elliott expressly rejected the State’s offer to let him plead guilty and be sentenced to less than thirty years at hard labor .in exchange for testifying against his co-defendant and cousin, Jermaine Rumley. Glenn Elliott expressly declined to testify against his co-defendant Jermaine Rumley. The record does not reflect that Glenn Elliott’s counsel prevented him from testifying in order to benefit the defendant Jermaine Rumley.
Glenn Elliott also implies there was an actual conflict because his and-Jermaine Rumley’s counsel failed to advise and explain a plea bargain offered by the State and erroneously told them it was better for both to go to trial. On May 21, 2014, prior to the presentation of the first witness at trial, the court addressed both of the' defendants as to a proposed plea agreement offered by the State, wherein each defendant would plead guilty to reduced charges of forcible rape and second degree kidnapping, and guilty to armed robbery, in exchange for a sentence of thirty years at hard labor for Glenn Elliott and twerity five years at hard labor for Jermaine Rum-ley. However, each defendant had to accept the deal. Both the defendants were advised of the mandatory penalty of life imprisonment at hard labor for both aggravated rape and aggravated kidnapping, and from ten to ninety-nine years at hard labor for armed robbery, should they proceed to trial and be found guilty. Glenn Elliott was also advised that the State was offering him a separate deal of a sentence less than thirty years at hard labor if he would agree to testify. Glenn Elliott said he would not testify but would plead guilty in exchange for thirty years. However, Jermaine Rumley twice voiced his rejection ■ of the twenty-five years pleá offer, and thus there was no deal as to either defendant. • •
142The record does not indicate that the defendants’ counsel advised either defen *668 dant not to accept the respective plea agreements offered by the State. Jermaine Rumley had an alibi defense, and there was no physical evidence or victim identification connecting him to the crimes. Yet, Jermaine Rumley twice rejected the plea offered to him. Glenn Elliott’s DNA was found on two swabs taken from the victim’s vagina, two swabs taken from her cervix, on a swab taken of discharge present on her underwear, and from a stain on her scrub pants. The record clearly reflects that Glenn Elliott did not want to testify against his cousin/co-defendant, Jermaine Rumley, and thus he rejected the plea agreement offered by the State that was contingent upon his testifying against Jermaine Rumley. Nothing in the record furnishes a basis to conclude that, had the defendants had separate counsel, Jermaine Rumley’s counsel would have recommended that he accept the plea, thus paving the way for Glenn Elliott to accept the alternative plea under which he would not have to testify against Jermaine Rum-ley. Glenn Elliott has failed to establish an actual conflict vis-a-vis the plea agreements offered by the State immediately prior to the first witness being sworn.
Finally, Glenn Elliott states that he did not intentionally waive his “constitutional right to a separate jury trial,” and that in fact he wanted to be tried separately from co-defendant Jermaine Rumley. Both defendants filed separate motions to sever, neither of which was granted. There is no merit to the argument that Glenn Elliott’s counsel assented to a joint trial with Jermaine Rumley because of any actual conflict of interest resulting from his. representation of both defendants.
|4SGlenn Elliott has failed to establish an actual conflict of interest rendering his counsel’s performance ineffective.
There is no merit to any part of this assignment of error.
DEFENDANT GLENN ELLIOTT’S PRO SE ASSIGNMENT NO. 4
In his fourth pro se assignment of error, Glenn Elliott argues that he was denied his Sixth Amendment right to present a defense because his attorney prevented him from testifying. As previously discussed in addressing the defendant’s Pro se Assignment of Error No. 1, the defendant has failed to show that he was denied his constitutional right to testify, which is the sole basis of his claim in the present assignment of error that he was denied his right to present a defense.
There is no merit to this assignment of error.
DEFENDANT GLENN ELLIOTT’S PRO SE ASSIGNMENT NO. 5
In this fifth pro se assignment of error, Glenn Elliott argues that he was denied a fair trial “when he was forced to go to trial with two bias jurors on his petit jury panel” — Juror No. 3 and Juror No. 63.
However, neither of these jurors served. The defense peremptorily excused both of these jurors. Juror No. 3, who was on the first vepire panel voir dired, was the subject of Glenn Elliott’s counseled Assignment of Error No. 1, in which he argued that the trial court erred in denying his challenge of Juror No. 3 for cause. Juror No. 63 was on the fourth venire panel voir dired. The defense likewise challenged Juror No. 63 for cause, but that challenge was denied, and the defense peremptorily struck her.
|44The present assignment of error is based entirely on the defendant’s incorrect supposition that he was forced to go to trial with Jurors No. 3 and 63 on the jury.
There is no merit to this assignment of error.
*669 DEFENDANT GLENN ELLIOTT’S PRO SE ASSIGNMENT NO. 6
In his sixth pro se assignment of error, Glenn Elliott argues that he was denied effective assistance of counsel when his counsel failed to call his codefendant Darren Holmes as a witness and “cross-examine him concerning crucial elements of the criminal charges and plea bargain.” Glenn Elliott asserts in the following sentence in his pro se brief that he was denied his right to impeach “one of the states [sic] star witness [sic].” Darren Holmes did not testify. The defendant correctly states that Darren Holmes was brought into the courtroom. This was during the State’s direct examination of one of its key witnesses, David Quinn, who testified to Darren Holmes’ actions/crimes. While the record does not reflect that Darren Holmes was brought into the courtroom in handcuffs and shackles as asserted by Glenn Elliott, Darren Holmes was then in custody and had pleaded guilty to forcible rape, second degree kidnapping, and armed robbery prior to the tidal of the defendants Glenn Elliott and Jermaine Rumley.
As to the issue of the defendant being denied effective assistance of counsel because his counsel did not call Darren Holmes as a witness, the State had allowed Darren Holmes to plead guilty to two lesser offenses and the armed robbery count, and receive three forty-year sentences to be served concurrently. Defense counsels’ decision not to call Darren Holmes as witness obviously would have been “within the ambit of trial strategy.” Therefore, the defendant has failed to show that his counsel was ineffective in not calling Darren Holmes as a witness.
UfiThe defendant also reiterates his arguments that his counsel was ineffective in failing to permit him to testify in his own defense and because he allowed the district attorney to utilize unspecified highly and gravely prejudicial other crimes evidence. However, these issues were discussed and disposed of in the defendant’s Pro se Assignments of Error No. 1 and No. 2.
In this assignment of error Glenn Elliott also complains that his counsel did not investigate the victim’s drug use history, and thus counsel was unable to discredit and impeach her. Defense counsel questioned the victim, at the outset of cross-examination, whether she had been taking any types of antidepressants, noting that an antidepressant medication had been discovered in her vehicle by the police. She said she took antidepressants after her son died. When asked how long she had been taking antidepressants, she replied that when her son died she took them for a little while, but could not remember how exactly how long. Defense counsel asked the victim when her son had died, and she replied that he had died on November 9, 2009, possibly giving rise to an inference that she had been taking antidepressants between then and the - day she was kidnapped, raped and robbed, January 26, 2012.
The defendant offers nothing but a baseless assertion to suggest that the victim had a “drug use history” to investigate, other than her use of the antidepressant medication. Defense counsel’s discovery that antidepressants, which presumably had been prescribed, were recovered from the victim’s vehicle does not suggest, given the State’s case as a whole, that a diligent defense attorney would have undertaken to “investigate” the victim’s “drug use history,” other than cross examining her on the matter, as defense counsel did in the present case. Defense counsel also objected during the victim impact statement at the sentencing [^hearing, when she was relating the difficulties she faced in coping *670 with day-to-day life after her ordeal. In his objection defense counsel noted that the victim had been taking antidepressant medication prior to the crimes, presumably inferring that the victim had some measure of difficulty coping prior to her kidnapping, rape, and robbery.
The defendant does not specifically assert that his counsel was ineffective in failing to investigate the victim’s “drug use history,” and the record does not support such a finding.
There is no merit to this assignment of error.
DEFENDANT GLENN ELLIOTT’S PRO SE ASSIGNMENT NO. 7
In his seventh pro se assignment of error, Glenn Elliot argues that the trial court abused its discretion in denying his motion for change of venue, and that he thus was denied his due process right to a fair trial.
While the record does not reflect that Glenn Elliott filed a written or oral motion for change of venue, the record does contain a written motion' for change of venue filed by David Quinn, which was denied by the trial court on October 11, 2012.
“Written motions by co-defendants are presumed to have been made on behalf of all defendants unless the contrary appears.” State v. Weary, 2003-3067, p. 25 (La.4/24/06), 931 So.2d 297, 315 (citing La.C.Cr.P. art. 842)[9]; State v. LaCaze, 1999-0584 p. 21 n. 37 (La.1/25/02), 824 So.2d 1063, 1079 (“Objections of l47one co-defendant is [sic] presumed to have been made on behalf of all unless the contrary appears. La.Code Crim.[sic] Proc. art. 842. By analogy, that applies to written motions as well. State v. Berger on, 371 So.2d 1309, 1313 (La.1979)(on rehearing).”).
There being no evidence in the present case indicating that the motion for change of venue was not filed on behalf of all defendants, David Quinn’s motion is presumed to have been filed on behalf of Glenn Elliott.
Glenn Elliott also argues that his defense counsel was ineffective in failing to investigate the change of venue issue and that counsel did not establish a legitimate change of venue “defense.”
A defendant is guaranteed an impartial jury and a fair trial. La. Const, art. I, § 16; State v. Magee, 2011-0574, p. 10 (La.9/28/12), 103 So.3d 285, 298; State v. Lee, 2005-2098, p. 32 (La.1/16/08), 976 So.2d 109, 132. To effect this guarantee, the law provides for a change of venue when a defendant establishes that he will be unable to obtain an impartial jury or a fair trial at the place of original venue. State v. Sparks, 88-0017, p. 15 (La.5/11/11), 68 So.3d 435, 456.
La.C.Cr.P. art. 622, providing for a change of venue, states:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
*671 In unusual circumstances prejudice against the defendant may be presumed. State v. Manning, 2003-1982, p. 7 (La.10/19/04), 885 So.2d 1044, 1061, citing State v. David, 425 So.2d 1241, 1246 (La.1983)(“[U]nfairness of a constitutional [^magnitude will be presumed in the presence of a trial atmosphere which is utterly corrupted by press coverage or which is entirely lacking in the solémnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob.”). Otherwise, the defendant has the burden of showing actual prejudice. Lee, 2005-2098, p. 32, 976 So.2d at 132.
To meet that burden, a defendant cannot simply prove the public’s general knowledge or familiarity with the facts of the case, but he must demonstrate the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case. State v. Clark, 2002-1463, p. 18 (La.6/27/03), 851 So.2d 1055, 1071 (“Thus, a defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue merely, by showing a general level of public awareness about the crime.”); State v. Frank, 1999-0553, p. 14 (La.1/17/01), 803 So.2d 1, 15. The defendant bears the burden of showing the existence of prejudice in the collective mind of the community that renders a fair trial impossible. Magee, 2011-0574, p. 11, 103 So.3d at 298.
Several factors for consideration by the trial court in determining whether actual prejudice exists, rendering a change in venue necessary, are:
(1) the nature of pretrial publicity and the degree to which it has circulated in the community; (2) the connection of government officials with the release of the publicity; (3) the length of time between the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.
Clark, 2002-1463, p. 16, 851 So.2d at 1070 (citing State v. Bell, 315 So.2d 307, 309 (La.1975)).
t43In addition to considering the seven Bell factors when reviewing rulings on motions to change venue, appellate courts have also examined the number of jurors excused for cause for having a fixed opinion as another gauge of whether prejudice exists in the public mind. Magee, 2011-0574, p. 13, 103 So.3d at 299.
Whether a defendant has met his burden of showing such actual prejudice is “a question addressed to the trial court’s sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion.” Manning, supra (quoting State v. Wilson, 467 So.2d 503, 512 (La.1985)).
. In the present case,.the defendant asserts on appeal that there was substantial media coverage and publicity concerning the defendants’ alleged criminal charges; that the jurors were exposed to a lot of negative, and high profile media publicity; and that it was impossible for him to get a fair trial in Orleans Parish. While, as noted, the defendant argues that his counsel was ineffective in failing to investigate the change of venue issue and present a case for a change of venue, the record reflects that the defendant David Quinn’s counsel competently did so — although the motion ultimately was denied.
Reviewing the Bell factors, it is a reasonable conclusion that the defendants’ al *672 leged gang rape, kidnapping and armed robbery of the home health care nurse victim received considerable media exposure in the days following the January 26, 2012 crimes, followed by subsequent reports of the arrests of the suspects in early February 2012, and their joint indictment in early March 2012. However, while it may confidently be said that the case stood out for its inhumanity and heinousness, the City of New Orleans consistently has a high violent crime rate, and new crime | ^outrages are routinely reported by the media, supplanting the crime outrages of yesterday. Photographic images of arrested individuals are displayed daily by the media in the metropolitan New Orleans area. The trial of Glenn Elliott and Jermaine Rumley commenced in May 2014, more than two years after their initial arrests and the initial media exposure about the crimes, the arrests, and the indictments.
There is nothing in the record to suggest that government officials, such as the Mayor of the City of New Orleans, the Superintendent of the New Orleans Police Department, the Orleans Parish district Attorney, said anything out of the ordinary (considering the heinous and high-profile nature of the crimes) about the defendants — e.g., “We will find, arrest, and prosecute the individuals responsible for this brutal crime.”
There was no evidence of other events occurring in the community which either affected or reflected the attitude of the community or individual jurors toward the defendants. For example, there was no evidence that citizens organized an anti-crime march in connection with the crime. While counsel for defendant David Quinn submitted the late June 2012 article about a fundraising event to benefit the victim, the focus of that event and the article was the victim, not the defendants. The record does not reflect that jurors were less than candid during voir dire concerning whether they had preconceived views of the case or the defendants’ guilt.
The record contains the transcript of the voir dire of the first venire panel. It does not reflect that any questions were asked by either the State or the defense of any members of that venire panel as to their knowledge of the case. Jury selection began at 10:56 a.m. on May 20, 2014, and ended at 6:31 p.m. that same day, with 1m the State peremptorily excusing twenty-one jurors and each defendant twelve. Nine jurors were excused for cause.
In the present case, two internet articles from www.nola.com contained a total of thirty-nine online blog comments by readers concerning the arrest and indictment of the defendants, comments which defendant primarily focuses upon in this assignment of error. Generally, the comments reflected outrage and disgust at the crimes. Some commenters called for severe punishment for the perpetrators; some comments had direct or thinly-veiled racial overtones. However, the record contains no evidence as to where these individuals resided. Any number of them could have been residents of parishes other than Orleans. Further, the record contains no evidence as to the type of individual who would register an account and go online to make such comments. Even assuming all thirty-nine were residents of Orleans Parish and represented a demographic cross section of the Orleans Parish population, it was only thirty-nine individuals.
Considering all the Bell factors, it cannot be said that Glenn Elliott has demonstrated the existence of an overriding prejudice in the community that prevented him from receiving a fair trial. Thus, he has failed to show that the trial court abused *673 its discretion in denying his motion for a change of venue.
As for Glenn Elliott’s claim that his trial counsel was ineffective for failing to “investigate the change of venue and didn’t establish a legitimate change of venue defense,” the claim is without merit. While defendant’s own counsel did not file a motion for change of venue, the one filed by his codefendant at the time, David Quinn, was effectively filed on behalf of all the defendants. David Quinn’s counsel supported her motion for change of venue with evidence of media exposure relating to all the defendants, from four sources. The trial court was well |S2aware of the issues regarding the motion for change of venue. Glenn Elliott has failed to show that there is a reasonable probability that, but for his counsel’s failure to file and support a motion for change of venue expressly on his behalf, that the trial would have been moved to another parish; that defendant would have been found not guilty; or that the jury would have been unable to reach a verdict and a mistrial declared. The defendant has failed to carry his burden of proving ineffective assistance of counsel entitling him to relief.
There is no merit to this assignment of error.
DEFENDANT GLENN ELLIOTT’S PRO SE ASSIGNMENT NO. 8
In his eighth pro assignment of error, Glenn Elliott argues that his counsel was ineffective for failing to hire a drug addiction expert for his defense relative to his assertion that the victim was a drug addict and had purchased cocaine from him. He offers nothing more than his unsupported allegations that the victim was a drug addict. The record reflects that his tidal counsel thoroughly cross-examined the victim and other -witnesses to highlight supposed inconsistencies in her testimony. Counsel also cross-examined the victim as to her use of a prescribed antidepressant medication. As previously ' discussed, Glenn Elliott’s trial counsel would not have been ineffective in declining to call Glenn Elliott as a witness to testify.
Glenn Elliott fails to offer any evidence to support his claim that his counsel was ineffective in failing to hire a drug addiction expert in his defense.
There is no merit to this assignment of error.
^DEFENDANT GLENN ELLIOTT’S PRO SE ASSIGNMENT NO. 9
In this ninth and final pro se assignment of error, Glenn Elliott essentially argues that the accumulation of errors cited in his pro se appellate brief resulted in substantial prejudice to him, depriving him of his right to a fair trial, and thus that he is entitled to a new trial.
However, no error or substantial prejudice to the defendant has been found in any of Glenn Elliott’s pro se assignments of error, or any of his counseled assignments of error. Accordingly, there is no merit to Glenn Elliott’s ninth assignment of error.
For the foregoing reasons, the respective convictions and sentences of the defendants Glenn Elliott and Jermaine L. Rum-ley are affirmed.
AFFIRMED

. The defendant Glenn Elliott was seventeen years old at the time he committed the offenses.

. See State v. Leger, 2005-0011, p. 98 (La.7/10/06), 936 So.2d 108, 173(quoting State v. Arnold, 548 So.2d 920 (La.1989)), ("[T]he question and the issue to be focused upon is whether the defendant sought to obtain something of value, be it sex or money or loss of simple human dignity, by playing upon the victim’s fear and hope of eventual release in order to gain compliance with his demands.”)

. Ultimately, Juror No. 3 did not serve on the jury as she was excuse on a defense peremptory challenge.

. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Marcantel, 2000-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55 (citing State v. Hearold, 603 So.2d 731, 734 (La.1992)).

. La. C.E. art. 412.2 states, in pertinent part:
A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the .time of the offense, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to thfe balancing test pro- ‘ vided in Article 403.
B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.

. U.S. Const amend. VI provides, in pertinent part:
In all criminal prosecutions, the accused shall ... have the Assistance of Counsel for his defense.

. La, Const, art. I, § 13 provides:
■When any person has been arrested or detained in connection with the investigation or commission-of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to assistance of counsel and, if indigent, his right to court appointed counsel. In a criminal prosecution, an accused shall be informed of the nature and cause of the accusation against him. At each stage of the proceedings, every person is entitled to assistance of counsel- of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment. The legislature shall provide for a uniform system for securing and compensating qualified counsel for indigents.

. La.C.Cr.P. art. 842 states:
If an objection has been made when more than one defendant is on trial, it shall be presumed, unless the contrary appears, that the objection has been made by all the defendants.