SEXTON, J. (Ad Hoc).
| ¶ Following a jury trial, the defendant, Aljerwon Moran, was convicted of second degree murder and attempted second degree murder. He was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence on the second degree murder conviction and to 30 years at hard labor without benefit of parole, probation or suspension of sentence on the attempted second degree murder conviction, with credit for time served. The sentences were ordered to run consecutively. The defendant appeals. We affirm the defendant’s convictions and sentences.
FACTS
On February 9, 2011, a shooting occurred at an apartment complex located near the intersection of South Second Street and Filhiol[1] Avenue in West Monroe. Roderick McCullon, age 20, was killed by a gunshot to the lower back which severed his spinal cord. His 41-year-old cousin, Marvin Fritz, was shot in the side, but survived.
At approximately 9:00 p.m., the West Monroe police responded to a “shots fired” call around South Second Street and Fil-hiol Avenue. Initially, no one was found in connection with this call. However, at about 9:25 p.m., the police received a call concerning an injured person at an address in the 400 block of South Second Street. At the scene, Officer Aubrey Rawls came into contact with Qurnesha Martinez, who pointed the officer to the spot where McCullon was lying on the ground near a fence. The officer was unable to detect a pulse. Emergency personnel transported McCullon to the | ghospital where he was pronounced dead. When McCullon was moved at the scene, a pair of channel lock pliers was found underneath him.
Subsequently, it was learned that a second shooting victim, Fritz, had been taken to the hospital by a family member shortly before McCullon was found. Fritz had run into a relative’s house on Filhiol, spitting up blood and declaring that his cousin Roderick was dead. While a relative drove him to the hospital, Ms. Martinez, a family friend, had gone to search for McCullon.
Randy Evans, the detective investigating the shooting, received a call from the defendant’s father who stated that his son had been involved in a shooting at an apartment complex. At the detective’s request, the defendant’s father brought his son to the police station. After advising the defendant of his rights, the detective interviewed the defendant in his father’s presence. The defendant stated that he and a friend, Lawrence Potter, were playing video games at the apartment on South Second Street where the defendant lived with his girlfriend when they were interrupted by a knock at the door. When he answered the door, two men barged in; *681 one of them announced that it was a robbery. The defendant said he tussled with the taller of the two men (presumably Fritz, who was about six feet tall). The shorter man (presumably McCullon, who was 5'5") attacked Potter with a monkey wrench or pliers. The defendant said he grabbed his 9mm gun from his couch and fired at the two intruders, who fled. According to the defendant, he and Potter left the apartment five to 10 minutes later and drove to the residence of the defendant’s mother in Potter’s white Charger.
| ^During his statement to the police, the defendant adamantly insisted that everything happened in the apartment and that he did not go outside during the confrontation with Fritz and McCullon. However, his father interrupted and said the defendant told him that it happened outside. The defendant was also asked about information the police had received about his involvement with drugs. He admitted to occasionally selling a blunt of marijuana. The police retrieved the gun used in the shooting from the defendant.
In the meantime, investigators at the scene detected a bullet furrow in the ground near the spot where McCullon was found. Backtracking from it, they discovered bullet casings leading back toward the landing of the defendant’s apartment. Nine shell casings were located on the ground outside of the defendant’s apartment. One of the shell casings was found 28 feet from the door of the defendant’s apartment. The officers determined that the distance from the door of the defendant’s apartment to the spot where MeCul-lon was found was 53 feet.
The investigators found no indication that there had been any physical altercation in the defendant’s apartment. There were no bullet holes, shell casings or blood evidence. One officer observed at trial that everything inside the apartment seemed undisturbed. During their search of the apartment, the police discovered a bag containing cigars and a small amount of a substance later identified as marijuana. Additionally, they found a digital scale and some hanging scales. According to the police, these items are commonly associated with marijuana distribution.
14 Crime lab analysis of the shell casings determined that all nine of them were fired from the defendant’s gun, a 9mm Hi-Point pistol. The magazine of this weapon could hold 10 cartridge cases. According to the crime lab firearm expert, the shell casings ejected to the right of the weapon and to the back an average of five to 10 feet.
On February 16, 2011, the defendant was arrested for second degree murder and attempted second degree murder. A grand jury indicted him for the same charges in April 2011.
In October 2011, defense counsel filed two motions in limine. One sought admission of statements to the police by two girls who said that prior to the shooting, McCullon and Fritz were talking about “hitting a lick,” a street term indicative of committing a crime for financial gain. The second motion sought to bar testimony of the defendant’s alleged use of and involvement in illegal drugs. At a pretrial hearing, the trial court denied the latter motion, ruling that the testimony pertaining to drugs was res gestae. The defense then withdrew its motion pertaining to the hearsay statements of the girls.
Jury trial was held in November 2011. Fritz testified that he lived in Michigan but was visiting family members in the West Monroe area in February 2011. He said that he and McCullon had spent the day of the shooting at a disabled relative’s house on Filhiol; McCullon provided care and living assistance to this relative. The *682 two men left the house and were walking to a convenience store when they decided to go see a guy with whom MeCullon was having an “issue.” Fritz knocked on the door of the |sapartment and asked the man who answered the door about the problem between him and MeCullon. The man took a swing at Fritz, and a physical fight ensued between them. MeCullon ended up fighting with another man who was present in the apartment. According to Fritz, he got only two to three feet inside the apartment door.
The next time Fritz saw MeCullon, he was on his stomach near the fence outside. The man MeCullon was fighting was on top of him. Seeing that MeCullon was losing his fight, Fritz testified that he disengaged from his own fight with the defendant and rushed to McCullon’s aid. At this point, he heard the first shot, but he did not see who was firing. Fritz ran. As he approached the street, a shot struck him and spun him. However, he was able to continue running. He fled to his relative’s nearby house.
Fritz denied that he and MeCullon intended to commit a robbery. He denied having any weapon and insisted that he did not know of MeCullon having any weapon. He identified the pliers found near McCul-lon as a tool he had been using earlier in the day and which he had left in a toolbox at his relative’s nearby house.
Two neighbors recounted hearing the shots. A woman on South Second Street heard shots, then saw a man with a handgun running; she estimated his height as between 5'5" and 5'8". (The record indicates that the defendant is 5'8" and Potter is 5'6".) She then saw a white Charger pull off. Another neighbor said he heard the shots; five minutes later, he saw the white Charger drive off.
|(;The state presented the testimony of Dr. Frank Peretti, the forensic pathologist who performed MeCullon’s autopsy. The parties stipulated that he was an expert in forensic pathology. He testified that MeCullon died as the result of a single gunshot wound that entered on the right lower back and exited mid-chest. The bullet went through the spinal cord and the thoracic aorta. There was no evidence on the skin of close range firing, which indicated that it was a distance gunshot wound. According to Dr. Peretti, the trajectory of the bullet from back to front, right to left in an upward direction suggested that MeCullon was leaning forward, running when he was shot. Additionally, because the bullet completely transected the spinal cord, the doctor opined that MeCullon would have collapsed almost immediately and been unable to walk or run.
When Detective Evans testified during the state’s case, he stated on cross-examination that the victims’ clothes were in the police evidence locker. Defense counsel lodged a Brady[2] complaint, asserting that he had not been informed of the clothes during discovery. The prosecutor responded that he believed that the defense had, in fact, been given an evidence sheet listing all evidence. The detective retrieved the clothes and brought them to court where they were displayed to the jury. The clothes were generally of dark colors, black or dark blue. MeCullon had also been wearing a camouflage jacket or sweatshirt. A box cutter was found with Fritz’s clothes.
|7The defendant testified on his own behalf. His testimony was consistent with his statement to the police in many respects. He said that he and Potter were smoking marijuana and playing video games when they heard a knock at the *683 door. A taller man barged in, announcing “It’s a robbery, bitch.” Then the second, shorter man entered; he had something in his hand with which he tried to hit Potter in the head. During the ensuing fight with the taller man, the defendant said he ended up on his couch. He grabbed his 9mm gun, and fired at the two intruders, who then ran from the apartment.
The defendant said he continued to fire at the fleeing men until he ran out of bullets. The defendant said that he had no idea he had hit them. However, Potter, who also testified for the defense, said that the first shot hit one of the intruders and that all shots were fired in the apartment. The defendant and Potter both testified that they shut the door after the intruders fled and did not leave until at least five minutes later. The defendant said he straightened the furniture before leaving. The defendant testified that he swept the bullets on a rug or mat and then tossed them off the mat outside the apartment. He admitted lying to the police when he said the shell casings had to be in the apartment. Potter admitted telling the police that they swept out all the shell casings; he then said he merely saw the defendant with a broom and assumed that was what occurred.
When asked about his father’s statement during the police interview that the defendant had told him that everything happened outside, the defendant said that he guessed his father had a “bad misunderstanding.” He | salso accused the police of cutting “a lot of stuff’ from the DVD of his police interview.
After the jury retired to deliberate, the defendant moved for a mistrial on the grounds that there was a Brady violation as to the clothing of the shooting victims and that the state had failed to inform the defense that Dr. Peretti was not licensed by the American Board of Pathology. The trial court denied the motion. It noted that the clothes had been produced by the state and used by the defense in its case. Additionally, the court observed that the defense had had an opportunity to test Dr. Peretti’s qualifications in open court but chose not to do so.
The defendant was convicted on both charges. The defense filed a motion for new trial which primarily relied upon the same issues raised in its motions in limine and its motion for mistrial. The motion for new trial was denied. Thereafter, the trial court sentenced the 24-year-old defendant to the mandatory term of life imprisonment without benefits for the offense of second degree murder. As to the conviction for attempted second degree murder, the court imposed a sentence of 30 years at hard labor without benefits, with credit for time served. The court ordered that the sentences be served consecutively.
The defendant appealed, asserting four assignments of error.
INEFFECTIVE ASSISTANCE OF COUNSEL
In his first assignment of error, the defendant argues that his counsel was ineffective in several respects: (1) failing to attempt to introduce the police offense report and affidavit of arrest; (2) failing to subpoena the two Ingirls who allegedly heard Fritz and McCullon planning a robbery; (3) failing to examine evidence, i.e., the victims’ clothing; and (4) failing to object to Dr. Peretti’s qualifications.

Law

The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. State v. Egan, 44,879 (La.App.2d Cir.12/9/09), 26 So.3d 938; State v. Wry, 591 So.2d 774 (LaApp. 2d Cir.1991). A *684 claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
To establish that his attorney was ineffective, the defendant first must show that counsel’s performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. The relevant inquiry is whether counsel’s representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. See Strickland, supra. The assessment of an attorney’s performance requires his conduct to be evaluated from counsel’s perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel’s judgment, tactical decisions and trial strategy, strongly presuming he has exercised reasonable professional judgment. State v. Grant, 41,745 (La.App.2d Cir 14/4/07), n 954 So.2d 823, writ denied, 2007-1193 (La.12/7/07), 969 So.2d 629; State v. Moore, 575 So.2d 928 (La.App. 2d Cir. 1991).
Second, the defendant must show that counsel’s deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. Strickland, supra. The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that, but for counsel’s unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Strickland, supra; State v. Grant, supra.
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief (“PCR”) in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); State v. Ellis, 42,520 (La.App.2d Cir.9/26/07), 966 So.2d 139, writ denied, 2007-2190 (La.4/4/08), 978 So.2d 325. When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. State v. Egan, supra. Because the record is sufficient to adequately resolve the issue of the effectiveness of the defendant’s counsel, and in the interest of judicial economy, we will address this defendant’s claims on appeal.
| ^Police report and affidavit of an-est
The offense report and affidavit of arrest prepared by Detective Evans contain statements indicating that Fritz and McCullon were shot during their attempted robbery of the defendant. The offense report indicates the homicide was a “criminal killed by private citizen” and “criminal killed in commission] of crime.” Both documents also contain references to the statements of the two girls who told police that Fritz and McCullon were going to “hit a lick” or rob someone.
Police reports are expressly excluded from the public records exception to the hearsay rule. La. C.E. art. 803(8)(b)(i). Therefore, the offense report and affidavit of arrest were inadmissible as hearsay. Any attempt by defense counsel to have the report and affidavit admitted into evidence would have been meritless and *685 proved futile. The failure to object to invalid errors may not be the proper subject of a claim of ineffective assistance of counsel. State v. Grant, supra. Thus, the complained of failure cannot provide a basis for a claim of ineffective assistance of counsel.

Failure to subpoena girls

Appellate counsel argues that trial counsel’s failure to subpoena the girls to testify was prejudicial to the defendant because he was less likely to be successful in convincing the jury that a robbery was occurring, thereby hindering his argument of justification for his use of deadly force.
A review of the record reveals that the decision of the defendant’s trial counsel to not subpoena the girls was clearly a strategic decision. Not |i2only did the females tell the police that Fritz and MeCullon were going to “hit a lick,” they also advised officers that the place they planned to rob was the location where MeCullon had purchased drugs the night before the shooting incident and that he had seen items he wanted to steal during the buy. Considering that the state was using the defendant’s alleged drug dealing to discredit his claims of justifiable homicide, it is apparent that trial counsel made the strategic decision to forgo the girls’ testimony of intent to rob the defendant to prevent the admission of their testimony about the defendant’s drug dealing.
We afford great deference to trial counsel’s tactical decisions and trial strategy. State v. Grant, supra. The defendant’s argument is, therefore, without merit.

Failure to examine the victims’ clothing

Appellate counsel argues that trial counsel’s failure to examine the victims’ clothing before trial constitutes ineffective assistance of counsel. (This also forms the basis for the defendant’s third assignment of error, discussed infra.) However, as noted supra, the clothing was produced during trial and fully utilized by trial counsel. Consequently, we find that the defendant suffered no prejudice as a result of this alleged deficiency. This argument is without merit.

Failure to object to qualifications

Appellate counsel argues that trial counsel’s failure to traverse or object to the qualifications of Dr. Peretti, the forensic pathologist who performed McCullon’s autopsy, amounted to ineffective assistance. We lañóte that trial counsel did raise the argument in his motion for new trial, which the trial court denied. If, in fact, trial counsel was aware at the time of Dr. Peretti’s testimony that he was not certified by the American Board of Pathology, it was clearly a strategic decision not to traverse his qualifications in light of Dr. Peretti’s extensive curriculum vitae and vast experience. Moreover, even if trial counsel had objected to Dr. Peretti’s qualifications, it is highly unlikely it would have had any effect on the outcome of the trial. This argument lacks merit.
Based on the foregoing, we find no merit to the defendant’s assignment of error asserting ineffective assistance of counsel.
MOTION IN LIMINE
The defendant argues that the trial court erred in refusing to grant his motion in limine wherein he sought to suppress any reference to his pre-arrest statements to officers that he used marijuana and occasionally sold blunts. The trial court found that the statements were admissible as res gestae. On appeal, the defendant asserts that the statements are not res gestae; rather, he urges that the statements constitute inadmissible other crimes evidence and that the prejudicial effect of the statements outweigh their *686 probative value. The defendant’s arguments are misplaced.
Generally, a trial court’s ruling on the admissibility of evidence of other crimes will not be overturned absent an abuse of discretion. State v. Preston, 47,-273 (La.App.2d Cir.8/8/12), 103 So.3d 525.
The general prohibition against the use of other crimes evidence does not bar admission of criminal acts which are an inseparable part of the |14whole deed. State v. Haarala^ 398 So.2d 1093 (La.1981). Even though the state did provide notice of intent in the instant case, the state is not required to give notice of its intent to offer evidence of acts integral to the current offense. La. C. Cr. P. art. 720; State v. Haarala, supra.
The test to determine whether other crimes evidence is an integral act is whether or not the exclusion of the evidence would deprive the state’s case “of narrative momentum and cohesiveness,” as well as bar the state from supporting its conclusions and the trier of fact from drawing any inferences necessary for an honest verdict. State v. Colomb, 98-2813 (La.10/1/99), 747 So.2d 1074; State v. Preston, supra.
The statements made by the defendant to police just hours after the incident regarding his illegal drug use and selling of drugs was clearly part of the narrative of the entire event and necessary to the state’s cohesive presentation of the events that took place. There was, therefore, no abuse of discretion in the trial court’s denial of the defendant’s motion in limine.
This assignment of error is meritless.
MOTION FOR MISTRIAL
In this assignment of error, the defendant challenges the trial court’s denial of his motion for mistrial, which was based on the state’s alleged failure to disclose to the defense the victims’ clothing and Dr. Per-etti’s lack of certification by the American Board of Pathology. First, as previously mentioned, the defendant claims that his trial counsel first became aware that the victims’ clothes were in the evidence locker during the testimony of Detective Evans. He argues on appeal that this was exculpatory evidence |1sthat the state failed to disclose. Next, the defendant argues that the state was aware that Dr. Peretti was not board certified and should have disclosed this allegedly exculpatory fact to defense counsel.

Law

Suppression by the prosecution of evidence favorable to an accused upon his request for such evidence violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, supra; State v. Carter, 43,304 (La.App.2d Cir.6/18/08), 987 So.2d 364, writ denied, 2008-2752 (La.9/25/09), 18 So.3d 86.
The term “Brady violation” is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence. State v. Carter, supra.. Under Brady, the state must disclose all evidence material to guilt or punishment and favorable to the defendant. State v. Black, 34,688 (La.App.2d Cir.5/9/01), 786 So.2d 289, writ denied, 2001-1781 (La.5/10/02), 815 So.2d 831. There are actually three components of a true Brady claim: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice must have ensued. State v. Carter, supra.
*687 The state’s duty of disclosure under Brady applies irrespective of the nature of the discovery request and even when a request has not been made. Evidence is material for Brady purposes if there is a reasonable probability, sufficient to undermine confidence in the outcome, that disclosure of the |1fievidence would have produced a different result. State v. Black, supra. The question to be answered is whether the undisclosed evidence would have created a reasonable doubt that would not otherwise exist, with reasonable doubt being determined in the context of the entire record. State v. Black, supra.
A discovery violation involving the state’s failure to disclose exculpatory evidence does not require reversal as a matter of the due process clause unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different result. State v. Carter, supra. In addition, failure to comply with discovery merits mistrial only when the state’s conduct substantially affects a defendant’s right to prepare a defense, or when it rises to the level of a legal defect. The trial court may offset the effect of late disclosure of information to the defendant by calling a recess or granting a continuance and the propriety of the remedy for late disclosure of information depends on the circumstances of each case. State v. Black, supra.

Discussion

First, regarding the victims’ clothing, again, although disclosure was late, it was made available for the defendant’s case in chief and defense counsel thoroughly used the evidence in questioning Detective Evans for the desired purpose of making the point that Fritz and McCullon were dressed in dark clothing. There is no indication that the result of the trial would have been different had defense counsel had possession, of the victims’ clothing earlier.
|17Second, the lack of board certification of Dr. Peretti would have had little to no impact on the outcome of this trial and did not in any way deprive the defendant of a fair trial. The evidence amply supports the jury’s verdict and that verdict would not likely have changed had the jury been aware that Dr. Peretti lacked a certification.
This assignment of error is without merit.
HEARSAY EVIDENCE
In this assignment of error, the defendant challenges the trial court’s ruling that held the statements of the two girls were hearsay and disallowed defense counsel from questioning Detective Evans about their statements. The defendant further argues that the statements were not offered for the truth of the matter asserted, but to impeach Fritz’s testimony. Alternatively, the defendant argues that the statements were part of the res gestae of the offense.
The two girls are out-of-court declar-ants. The statements concerned the intent of Fritz to rob the defendant. There is no exception to the hearsay rule that would allow these statements to be admissible through cross-examination of Detective Evans or otherwise. There is no provision allowing a witness to be impeached through testimony of another witness by out-of-court statements of unavailable de-clarants. The only purpose that could have been served by the statements being admitted was to tend to show that Fritz intended to rob defendant, i.e., for the truth of the matter asserted. Furthermore, we do not see how the statements, which pertained to a conversation that al *688 legedly happened the day before the shooting and liswere given to the police two days after the shooting, can be construed as being res gestae.
This assignment of error lacks merit.
ERROR PATENT
La. C. Cr. P. art. 873 requires that 24 hours must elapse after a motion for new trial is overruled and before the defendant is sentenced, unless the defendant waives the delay. State v. Bruce, 47,055 (La. App.2d Cir.5/25/12), 93 So.3d 717. The record shows no such delay or waiver. The defendant does not raise any objection in his appeal and there is no showing of prejudice; therefore, we find that the error is harmless.
CONCLUSION
The defendant’s convictions and sentences are affirmed.
AFFIRMED.

. The name of this street is spelled a variety of ways in the record, including Filhoil and Filhol. We utilize the spelling used by the court reporter in the trial transcript.

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).