STATE OF LOUISIANA     *     NO. 2024-KA-0089

VERSUS     *

DESTINY LACOURSE     *

COURT OF APPEAL

FOURTH CIRCUIT

*

STATE OF LOUISIANA

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 554-895, SECTION "F"
Honorable Robin D. Pittman, Judge
\* \* \* \* \* \*
**Chief Judge Terri F. Love**
\* \* \* \* \* \*

(Court composed of Chief Judge Terri F. Love, Judge Rachael D. Johnson, Judge
Nakisha Ervin-Knott)

Richard James Richthofen, Jr.
RICHTHOFEN & ASSOCIATES, LLC
3900 Canal Street
New Orleans, LA 70119

       COUNSEL FOR DEFENDANT/APPELLANT

Jason Rogers Williams
District Attorney, Orleans Parish
Patricia Amos
Assistant District Attorney
619 South White Street
New Orleans, LA 70119

       COUNSEL FOR STATE OF LOUISIANA/APPELLEE

**CONVICTION AND SENTENCE AFFIRMED**
**AUGUST 16, 2024**

Defendant, Destiny Lacourse, appeals her armed robbery conviction. Defendant's sole assignment of error contends she received ineffective assistance of counsel at trial in that her trial counsel refused to allow her to testify and offered no viable defense. Defendant's no viable defense claim primarily centers on counsel's alleged inadequate cross-examination of State witnesses and his failure to present an alibi defense that placed Defendant at another location at the time of the offense.

The record herein fails to document that trial counsel prevented Defendant from testifying or that counsel's cross-examination of witnesses was deficient enough to meet the criteria to prevail on a claim of ineffective assistance of counsel. However, the record is incomplete to consider Defendant's claim that counsel failed to set forth an alibi defense. Accordingly, we affirm Defendant's conviction and sentence and reserve for post-conviction consideration Defendant's claim that counsel was ineffective for his failure to assert an alibi defense.

**PROCEDURAL AND FACTUAL HISTORY**

The State charged Defendant with one count of armed robbery with a firearm, in violation of La. R.S. 14:64.3, arising out of a robbery at the Lush

1

Cosmetics Store ("Lush").[1]  Defendant entered a plea of not guilty.  The district court denied Defendant's motion to suppress the identification and found probable cause; thereafter, the matter proceeded to trial.

*Trial Testimony: State's Case-in-Chief*

Sgt. Mark McCourt

Sgt. McCourt, the custodian of records, authenticated the recorded 911 phone call and the associated incident recall report.  Upon authentication, the items were introduced into evidence.

The 911 call revealed that the caller described the perpetrator as a woman wearing a blue/gray short-hair wig, "drawn-on eyebrows," a long skirt, and a pink, long-sleeved, button-up shirt.  The caller relayed that "[the perpetrator] showed me a gun in her bag and said that she needed all my cash."   The caller stated that the perpetrator took about five hundred dollars and placed it in the perpetrator's medium-sized handbag.  The caller added that a co-worker saw the perpetrator flee out of the store.

Officer Miles Guirreri

Officer Guirreri testified that he was dispatched to investigate the armed robbery at Lush.  Upon his arrival, a Lush employee (the "victim") told Officer Guirreri that she "bagged" two items the perpetrator had touched. Officer Guirreri

---

[1] La. R.S. 14:64.3(A) provides an additional penalty for the commission of armed robbery, stating the following:

> When the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned at hard labor for an additional period of five years without benefit of parole, probation, or suspension of sentence. The additional penalty imposed pursuant to this Subsection shall be served consecutively to the sentence imposed under the provisions of R.S. 14:64.

said the bagged items were collected as evidence. Officer Guirreri identified photographs of the store's interior and exterior and relayed that surveillance footage had been collected from the next door Unique convenience store.

On cross-examination, Officer Guirreri verified that the victim had described the perpetrator's firearm as "silver and black."

On redirect examination, Officer Guirreri reiterated that the victim stated that the perpetrator displayed a firearm and demanded that the victim "give [the perpetrator] everything."

Sgt. Aaron Harrelson

Sgt. Harrleson, the lead investigator, identified Defendant in open court. He analyzed the surveillance footage introduced into evidence as depicting the following:

> The defendant exited the Lush Cosmetic Store in a haste, ran out to where this cab is pulling up, with a pink top and the floral bottom. That is where you see the cab, which is marked, "0438." The cab continued down Royal Street out of the sight of the camera.

Sgt. Harrelson advised that another store employee saw Defendant enter the business and recognized Defendant as a previous customer. The employee's description of the perpetrator matched the description of the person in the surveillance footage who had fled the crime scene and entered the taxi cab.

Sgt. Harrelson revealed that the driver of the "0438" taxi cab disclosed that the driver "was hailed by a white female wearing a pink top and a floral dress who seemed like she was scared." Sgt. Harrelson said that the surveillance footage substantiated that the same person who entered the cab at Lush went into the Unique convenience store. He continued:

3

I was able to get video footage from within Unique that clearly detailed an up-close face shot of the defendant, which I then used to make a BOLO[2] along with Sergeant Bulling and send it out.

Sgt. Harrelson's other observations from the surveillance footage included the following:

You see the same female exiting [the cab] and now she is approaching Unique, which is consistent with the statement given by the taxi cab driver…Here, defendant is exiting the store. You see the wig, the grayish-bluish— whatever color that is, with the floral bottom, exiting. She's going to the left.

Sgt. Harrelson stated that after the BOLO was issued, another detective in a near-by district identified the suspect as "Karen Stockton" ("Ms. Stockton"). Sgt. Harrelson obtained an arrest warrant for Ms. Stockton for the robbery. On the following morning, Sgt. Harrelson said he learned of another report that identified the suspect as the defendant, Destiny Lacourse. Sgt. Harrelson noted that the new suspect "bore a striking resemblance to Karen Stockton." As a result, he voided the arrest warrant for Ms. Stockton and procured search warrants to further investigate both suspects.

Sgt. Harrelson concluded that Ms. Stockton had no ties to the case after he reviewed her phone and social media accounts. In contrast, he discovered statements posted to Defendant's social media account, such as, "[p]eople, stop calling me; I don't know why people are calling me; I'm not involved in anything. I'm getting on the straight and narrow path; I didn't do anything wrong."

---

[2] Sgt. Harrelson clarified that a "BOLO" was "a 'Be on the look-out' or wanted poster that we send out to media and officers, so they know who to look for."

Sgt. Harrelson said that another police officer— without knowledge of the case—administered a "six-pack" photographic line-up to the victim. Upon identifying Defendant as the perpetrator, the victim wrote,

> I recognize this woman from the robbery. Her nose and mouth shape immediately reminded me of this person. I can see the differences she made on her appearance, but I am positive this is the same individual.

Based on the positive identification of Defendant and corroborating information, Sgt. Harrelson obtained an arrest warrant for Defendant. The resulting search of Defendant's residence yielded floral clothing, a Glock, forty caliber firearm, and several boxes of ammunition. Sgt. Harrelson acknowledged that he was not able to connect the firearm recovered to the robbery and that he did not recover the wig or the exact clothing depicted in the surveillance video. Sgt. Harrelson stated that a buccal swab was taken from the bar of soap and "bath bomb" that Defendant had brought to the cash register. He later received notice that the swab results matched Defendant's DNA profile.

On cross-examination, Sgt. Harrelson recalled that witnesses had described the suspect as having "scarring on the face and/or cheek." He also conceded that the gun recovered from Defendant's residence was black in color, rather than black and silver as described by the victim. Sgt. Harrelson admitted that someone named Richard Cortez claimed to be the owner of the firearm, the ammunition, and the residence where Defendant lived. Mr. Cortez told the police that Defendant did not have access to the firearm and did not possess the firearm at any time.

Sgt. Harrelson acknowledged that his investigation of Ms. Stockton showed an arrest for burglary; a medical condition that left scars on her arms and legs; and moreover, showed "she had to do something with make-up and her eye-brows." He

5

also acknowledged that a photograph posted to Ms. Stockton's Facebook account depicted her in a wig substantially similar to that worn by the suspect during the robbery in the instant case.

Sgt. Harrelson explained that Ms. Stockton was excluded as a suspect because her cell phone records indicated that she "was not in that area at the time." Sgt. Harrelson, who had obtained Ms. Stockton's cell phone number from her parole officer, conceded that the investigation later determined that Ms. Stockton's cell phone account belonged to someone named Rashida Jones. The account had been opened a month prior to the date of the robbery. Sgt. Harrelson admitted that he did not investigate any relationship between Ms. Stockton and Defendant or whether the residential address connected with the cell phone account bore any connection to Ms. Stockton. Sgt. Harrelson also acknowledged that Ms. Stockton's photograph was not included in any photographic line-up and that her DNA had not been analyzed.

On re-direct examination, Sgt. Harrelson read the victim's statement wherein the victim emphatically stated that she was "positive" that Defendant was the perpetrator.

<u>Jonie Bertin</u>

Ms. Bertin, the victim, was Lush's assistant manager on the incident date. She observed Defendant browse merchandise for about eight to ten minutes before Defendant came to the register. The victim testified that as she began to finalize the sale, Defendant displayed "a gun coming out of the top of [her] purse," and declared that she was "going to need all of the cash." The victim handed over the cash and Defendant left.

6

Following the robbery, the victim placed the items Defendant had touched "towards the back area of the till" to prevent tampering. She explained that the police advised Lush employees to not tamper with anything that could impact DNA evidence.

The victim stated that the firearm was positioned so she could only see "a few inches" of the barrel showing "right out of the top, so that only [she] would know what was going on." The victim was about two feet away from the Defendant and described Defendant's firearm as "black, but it had like a—I don't know if it was the light casting silver, because I know I couldn't—I was saying kind of like, black and silver, but it was a black gun." The victim also described Defendant's eyebrows as either "dyed an unnatural color or [] drawn on."

The victim testified that she instantly recognized Defendant as the perpetrator from a photographic lineup that took place about a month after the robbery. The victim stated that "even though she [Defendant] didn't have the same sort of, like, trackings (sic) as what she had come in, like it was her face." She expressed one hundred percent certainty that the selected photograph depicted the perpetrator. The victim iterated that Defendant had stolen about "six or seven hundred dollars." She also averred that another store employee maintained that he had seen Defendant in the store on a previous occasion.

On cross-examination, the victim admitted that she had little experience with firearms. Notwithstanding, she recognized that the weapon was not a toy, stating, "I knew it was more serious than, like a BB-gun or anything else like that." She explained further, "even if I had seen the entirety of it, you know, it's a gun. It felt like a gun; she was threatening me with needing all of the money, so it was implied in every way that bodily harm could happen to me and my staff."

7

The victim acknowledged that she initially had described the assailant as a white woman with a small build and a pale complexion, with "unnatural eyebrows," whereas the line-up depicted Defendant with "her natural hairline and what appear[ed] to be natural eyebrows." Regardless, the victim asserted that she could identify Defendant as her perpetrator based on Defendant's "bone structure, actual facial features, things she couldn't have changed."

Ryan O'Leary

Mr. O'Leary, a Louisiana State Police Crime Lab DNA Analyst, testified as an expert in the field of DNA analysis without objection. Mr. O'Learly examined one Lush brand bag containing one blue and green bath bomb and a brand bag containing one pink bar of soap. He concluded that the sample taken from the bath bomb was "consistent" with Defendant's DNA and that Defendant could not be excluded as the contributor of the sample taken from the bar of soap.[3] Based on the statistical results his analysis yielded, Mr. O'Leary opined that the items of evidence from which the samples were taken had not been cross-contaminated.

On cross-examination, Mr. O'Leary testified that he could not determine the precise time or the manner in which the DNA would have been transferred to the bath bomb or the soap.

***Trial Testimony: Defense case-in-chief***

The defense re-called Officer Guirreri to the stand. He testified that the victim told him that the perpetrator had not pointed the firearm directly at her; however, the victim saw the gun "and feared for her safety."

---

[3] Mr. O'Leary determined that the probability of another person with the same DNA profile consistent with that taken from the bath bomb was one in "834 septillion," and that the probability of another person with the same DNA profile consistent with that taken from the bar of soap was "1.6 sextillion," among the Caucasian population.

Officer Guirreri admitted that he could not recollect the substance of his interviews with some of the witnesses at the scene. In response, the State stipulated that the footage from Officer Guirreri's police-worn body camera would show the victim described Defendant's firearm as "black and silver." The State also stipulated that the body camera footage would show a witness describing the perpetrator appearing to have "significant stabbing and/or scarring around [her] mouth."

### *Jury Verdict*

At the conclusion of trial, the jury found Defendant guilty of the lesser included offense of armed robbery, a violation of La. R.S. 14:64. Defendant was sentenced to serve ten years imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence. Thereafter, Defendant was granted an out-of-time appeal.

## DISCUSSION

Defendant's sole assignment of error is that her attorney provided ineffective assistance at trial. This error falls within two broad categories: (1) counsel refused to allow her to testify; and (2) trial counsel did not offer a viable defense in his alleged failure to adequately cross-examine the State's witnesses and did not present Defendant's alibi defense. We shall first consider Defendant's claim that trial counsel was ineffective for his refusal to permit her to testify.

### *Ineffective Assistance of Counsel: Denial of Right to Testify*

Defendant raises the issue of her counsel's refusal to allow her to testify under the auspices of ineffective assistance of counsel. However, the denial of a defendant's right to testify presents a constitutional violation distinct from ineffective assistance of counsel.

A defendant has a constitutional right to testify in his own defense. La. Const. art. I, § 16; *State v. Dauzart*, 1999-3471, p. 6 (La. 10/30/00), 769 So.2d 1206, 1207 (citations omitted). The denial of the right to testify after a criminal defendant unequivocally makes known his desire to do so is not amenable to a harmless error analysis. *State v. Hampton*, 2000-0522, p. 10 (La. 3/22/02), 818 So.2d 720, 727. However, a presumption exists that a defendant knowingly waived his right to testify when he does not testify at trial; moreover, the defendant has the burden of proof to satisfy the criteria to refute that presumption. *State v. Rumley*, 2014-1077, p. 31, (La. App. 4 Cir. 12/16/15), 183 So.3d 640, 661-62. The *Rumley* Court explained as follows:

> When a criminal defendant does not take the stand to testify, a court should presume he has knowingly and voluntarily waived his right to do so. *State v. Marzett*, 2013-0274, p. 13 (La. App. 4 Cir. 8/28/13), 123 So.3d 831, 839 (citing *Hampton*, 2000-0522, p. 14, 818 So.2d at 727). A defendant can only rebut such presumption by showing that his attorney caused him to forego his right to testify. *Hampton*, 2000-0522, p. 14, 818 So.2d at 729 (quoting, *Passos–Paternina v. United States*, 12 F.Supp.2d 231 (D.P.R. 1998)). To make that showing a defendant must: (1) allege specific facts, and present an affidavit by his trial attorney, from which a court can reasonably find that the attorney informed the defendant "that he was legally forbidden to testify or in some similar way compelled him to remain silent;" and (2) demonstrate that the record would support a finding that those specific factual allegations would be credible. *Id.*, 2000-0522, p. 14, 818 So.2d at 729-730.

*Id.*

In applying the first *Rumley* factor to rebut the presumption of a knowing waiver, Defendant herein neither cites specific facts or produces an affidavit from trial counsel to attest that counsel denied Defendant the right to testify. We also find the record devoid of any documentation that Defendant desired to testify at

10

trial. Instead, Defendant makes merely conclusory, unsupported allegations in her brief. Such conclusory, unsupported allegations do not suffice for this Court to determine that her trial attorney legally forbade Defendant from testifying or compelled her to remain silent. *See State v. James*, 2005-2512, p. 1 (La. 9/29/06), 938 So.2d 691 ("'mere conclusory allegations are insufficient' to rebut a presumption arising from a defendant's silence at trial that he waived his right to testify."). Accordingly, as Defendant has provided no supporting documentation to rebut the presumption that she knowingly and voluntarily waived her right to testify, Defendant's claim that her counsel was ineffective for denying her the right to testify lacks merit.[4]

We now address Defendant's ineffective assistance of counsel claim that trial counsel failed to offer a viable defense based on counsel's alleged failure to adequately cross-examine witness and offer an alibi defense.

### *Ineffective Assistance of Counsel-Failure to Cross-Examine Witnesses*

In general, claims of ineffective assistance of counsel are better raised in post-conviction proceedings where a district court can hold an evidentiary hearing and explore the claim more fully, if necessary. *State v. Paulson*, 2015-0454, p. 9 (La. App. 4 Cir. 9/30/15), 177 So.3d 360, 367 (citation omitted). However, if the issue is raised on appeal and the record contains sufficient information to decide the issue, a court may consider it in the interest of judicial economy. *Id.* Here, Defendant alleges trial counsel was ineffective in failing to cross-examine witnesses and to call witnesses as follows: (i) failure to adequately cross-examine the State's witnesses regarding the "disconnect" between reports of a black and

---

[4] Having found that Defendant has failed to satisfy the first *Rumley* factor, we need not consider the second *Rumley* factor— whether the alleged facts and the attorney affidavit demonstrate that the record supported a finding that the specific factual allegations were credible.

silver handgun and a black handgun; (ii) failure to highlight the physical differences between the perpetrator and Defendant, particularly, Defendant's lack of tattoos and the differences in hair coloring; (iii) failure to highlight the difference between the floral pattern worn by the perpetrator in the video and the clothing seized from Defendant's residence; (iv) failure to call Richard Cortez to establish that Defendant was not the owner and did not have access to the seized gun; and (v) failure to call the Unique convenience store employee depicted in the video who appeared to greet the perpetrator with a kiss on the cheek.[5]

Our review shows that these issues were substantially raised at trial. As to the alleged disparity in the description of the gun used in the robbery and the gun seized, the transcript reflects that trial counsel extensively questioned the victim and Sgt. Harrelson regarding the victim's initial description of the gun as black and silver, counsel emphasizing that the gun seized from Defendant's residence was black. Trial counsel also obtained a stipulation from the State that the initial description of the gun was black and silver and he referenced the alleged disparities in closing argument. Most importantly, Sgt. Harrelson acknowledged on cross-examination that the seized handgun was not positively identified as the gun used in the robbery.

The record also documents that trial counsel cross-examined Sgt. Harrelson regarding the extreme similarity in features between Defendant and Ms. Stockton. Counsel's examination elicited that Ms. Stockton was the original suspect and noted that Ms. Stockton had markings and tattoos, whereas Defendant did not. Additionally, trial counsel's cross-examination revealed that no clothing matching

---

[5] As referenced, *infra*, the Unique convenience store store video footage was introduced into evidence and was shown to the jury.

the perpetrator's outfit was found at Defendant's residence; established that Defendant had previously been in Lush; and that the DNA analyst could not definitively state when Defendant's DNA was transferred to the soap/bath bomb. Moreover, trial counsel's cross-examination of Sgt. Harrelson established that Richard Cortez claimed to be the owner of the seized gun and encompassed Mr. Cortez's statement to police that Defendant did not possess or have access to the gun. Finally, trial counsel emphasized in closing argument that the State failed to call as a witness the Unique convenience store employee seen kissing the perpetrator upon her entry to that store.

Our review of the record shows that the trial transcript expressly contradicts Defendant's assertion that trial counsel asked "no questions" or made any argument on these ineffective of counsel claims. Accordingly, in the interest of judicial economy, this Court shall review the merits as to these claims.

Elements of Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel,

> [f]irst, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment [to the U.S. Constitution]. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). In the event the defendant fails to make an adequate showing on one of the components, it is unnecessary to address the others. *State ex rel. Byrd v. State*, 2016-0574, p. 3 (La. 8/4/17), 223 So.3d 1150, 1151. To carry his burden of proof that counsel's errors deprived the defendant of a fair trial, the defendant must

show that a reasonable probability exists that the result would have been different but for counsel's deficient performance. *State v. Reichard*, 2005-1262, p. 5 (La. App. 4 Cir. 6/21/06), 935 So.2d 727, 730-31. "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 2005-1262, p. 5, 727 So.2d at 731(quoting *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2068).

"An 'effective counsel' has been defined as 'not errorless' counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance." *Id.*, 2005-1262, p. 5, 935 So.2d at 731. A reviewing court accords deference to trial counsel's judgment, tactical decisions, and trial strategy, affording counsel the strong presumption that he utilized reasonable professional judgment. *State v. Moran*, 47,804, p. 9 (La. App. 2 Cir. 4/10/13), 135 So.3d 677, 684. Accordingly, trial strategy-type errors do not amount to ineffective assistance of counsel. *Reichard*, 2005-1262, p. 5, 935 So.3d at 731. These trial strategy errors also encapsulate counsel's decision as to whether or not to call certain witnesses. *See State v. Bias*, 2014-1588, p. 11 (La. App. 1 Cir. 4/24/15), 167 So.3d 1012, 1021.

In the instant matter, Defendant maintains counsel was ineffective because his inadequate cross-examination and decision not to call potential witnesses constituted a trial without a defense. Defendant argues the following:

> No viable defense was offered at trial on Ms. Lacourse's behalf. No evidence was refuted or brought forward to defend Ms. Lacourse. Trial counsel failed to adequately question witnesses in her defense. And additionally, no questions were asked regarding the conflict in the gun use or the first suspect considered. Trial counsel has simply stated that the defense was "reasonable doubt."

Hence, Defendant's own argument expressly asserts that trial counsel's defense emanated from his strategy to base Defendant's defense on reasonable doubt. The record supports this assertion.

Trial counsel cross-examined the State's witnesses to establish the following: (1) the physical resemblance between Defendant and Ms. Stockton, the initial suspect, and that Ms. Stockton's physical markings more closely resembled the features of the perpetrator as described by the witnesses; (2) the State's DNA expert could not determine when Defendant's DNA appeared on the soap products; (3) Ms. Stockton was never placed in a line-up; (4) the phone records relied on to exclude Ms. Stockton as a suspect actually belonged to another party; (4) the State's failure to identify or speak with the Unique employee who greeted the perpetrator with a kiss on the cheek; (5) no recovery was made of the gun or the articles of clothing worn in the robbery; (6) the seized gun belonged to Richard Cortez; and (7) the State's failure to execute a warrant to search Ms. Stockton's premises. Trial counsel re-urged these alleged "holes" in the State's case in his closing statement, arguing, in part, the following:

> You got a cat and a mouse, stick them in a box. You listen. After a couple of minutes, you lift the lip off. Mouse [is] gone, cat's there. You haven't seen anything and there's a hole in the corner of the box. You can't tell at that moment, at that time, whether or not the cat got the mouse, or the mouse ran. That hole, ladies, and gentleman, is reasonable doubt.

Clearly, Defendant did not receive the desired result from counsel's strategy; however, a trial counsel's effectiveness is judged on whether counsel's representation was reasonable based on counsel's perspective at the time. *See State v. Robinson*, 2022-310, p. 16 (La. App. 5 Cir. 4/12/23), 361 So.3d 1107, 1121 (citations omitted). As this Court espoused in *Reichard,* "[g]iven that 'opinions

may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy was successful." 2005-1262, p. 5, 935 So.2d at 731 (citations omitted).

In this matter, we cannot say that trial counsel's judgment to employ reasonable doubt as a defense was not reasonable based on the existing circumstances and the evidence introduced at trial. Defendant has not proven that that trial counsel's reasonable doubt defense was so egregious so as to deny Defendant a fair trial or to undermine the confidence in the result reached. Accordingly, Defendant's claim that his trial counsel was ineffective because he inadequately cross-examined witnesses and did not call Richard Cortez or the Unique employee as witnesses based on a reasonable doubt strategy lacks merit.

### *Alibi Defense*

Defendant's remaining claim of ineffective counsel results from her contention that trial counsel did not produce her phone records and call witnesses who could confirm that Defendant was in Norco, Louisiana at the time of the offense. The record is devoid of any evidence that Defendant intended to offer an alibi as a defense. *See* La. C.Cr.P. art. 727, which provides, in pertinent part, the following:

> Upon written demand of the district attorney stating the time, date and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney a written notice of his intention to offer an alibi.

The record also does not include any evidence that Defendant told trial counsel of her alibi defense. As such, we decline to review this alleged error, preserving

16

Defendant's right to urge this ineffective assistance of counsel argument in post-conviction relief.

## CONCLUSION

Defendant has not shown she was deprived of her right to testify or proven her counsel was ineffective for his alleged failure to adequately cross-examine or call certain witnesses to testify. These errors relative to counsel's alleged failure to examine or call witnesses fall within the ambit of trial strategy, which does not establish an ineffective assistance of counsel claim. Defendant's remaining allegations regarding trial counsel's failure to assert an alibi defense are relegated for post-conviction relief. Accordingly, we affirm Defendant's conviction and sentence.

**CONVICTION AND SENTENCE AFFIRMED**